## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

**TERRY R. SANFORD, et al.,**

      **Plaintiffs,**

v.                                     **Case No. 3:08CV835**

**COL. WILLIE B. FULLER, et al.,**

      **Defendants.**

### WILLIE B. FULLER, AND POLICE OFFICER DEFENDANTS' MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

NOW COME the Defendants, Willie B. Fuller, and Officers Mark Bailey ("Bailey"), Officer Ellsworth C. Pryor, ("Pryor"), Officer Loran B. Carter ("Carter"), Officer Craig L. Branch ("Branch"), Officer Aaron LaVigne, ("LaVigne") or collectively as "Police Officer Defendants"), each by his counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, states the following for their Memorandum in Support of Motion for Summary Judgment.

### I.  STATEMENT OF THE CASE

Plaintiffs' Amended Complaint seeks damages arising out of the death of John Sanford ("Sanford"). On December 20, 2006, Sanford was admitted to the Medical College of Virginia Hospital to remove one of his kidneys. Amended Complaint, ¶ 24 ("Am. Comp. ¶__"). Post-surgery, Sanford began experiencing periods of delirium. Am. Comp. ¶ 29. During the late hours of December 23, and the early morning hours of December 24, 2006, Sanford became violent and combative" with staff." Am. Comp. Ex. D, p.3; F, p.4. Virginia Commonwealth University Police Department ("VCU PD") officers were called to Sanford's room to assist staff. Am. Comp. ¶ 43. Shortly after he

was restrained, it was observed that Sanford was not breathing. Am. Comp. ¶ 46.

Despite efforts to revive him, Sanford died. Am. Comp. ¶ 47 .

## II. CLAIMS AGAINST THE DEFENDANTS

Plaintiffs assert 15 separate claims against these Defendants in their Amended

Complaint. Counts 1 and 3, are against Bailey individually. Counts 2, 4, 6, 8, 12, 13, 14,

15, 17, 18, 19, 22 are against Bailey, Pryor, Carter, LaVigne and Branch. Count 9 is

against Fuller individually. Counts 1, 2, 3, 4, 6, 8, 9, and 12, are premised on federal

constitutional violations and are brought pursuant to 42 U.S.C. § 1983. The remaining

counts are state common law claims under Virginia law.

## III.   STATEMENT OF MATERIAL AND UNDISPUTED FACTS[1]

### A. The Events of December 20, 2006 - December 22, 2006

On December 20, 2006, Sanford was admitted to the Main Hospital of the

Virginia Health Systems Authority ("VCUHSA"), for the removal of his kidney.[2]  The

attending physician responsible for his care was Dr. Mayer Grob. MG ¶¶ 1-5. Sanford

was a private medical patient who was neither a prisoner nor an involuntarily committed

---

[1] Due to the number of individuals involved, references to an affidavit (or declaration) will follow the following format:  Mark Bailey, "MB ¶__", Craig Branch, "CB ¶__", Jennifer Brown, "Jen.B ¶__", Jowanna Brown, "Jow.B¶__", Carter, "LC ¶__", Dr. Mayer Grob, "GB __", Sammy Lancaster, "SL ¶__", Aaron LaVigne, "AL ¶__", Conan Phelan, "CP ¶__", Ellsworth Pryor, "EP ¶__", Rachel Ross, "RR ¶__", Grant Warren, "GW ¶__".  References to a deposition page will follow this format: Jowana Brown, "Jow.B p.__", Marlene Cooper, "MC p.__", Patti Ferguson, "PF p.__", William Gormley "WG p.__", Sammy Lancaster, "SL p.__", Terry Sanford "TS p.__". Due to page limit constraints, and so as to not degrade the readability of this memorandum, not  every fact cited in the memorandum will be referenced to each and every witness that may be able to testify about that fact. Nor will references be repeated in the argument. The Defendants respectfully ask this Court to consider all the facts contained in the submitted affidavits and deposition transcripts in considering their motion.

[2] VCUHSA operates a medical complex consisting of hospitals, clinics and offices in downtown Richmond. The complex is commonly referred to as MCV Hospital.

person. He received care from Dr. Grob and other providers because he voluntarily chose to receive care from them, and not because he was required to receive care from Grob or MCV. MG ¶¶ 3-6; Jow.B ¶ 5. Sanford was, at all times he made decisions to receive medical care, competent to make medical care decisions on his own behalf and indeed personally made all of these. He personally made the decision to undergo surgery on December 20, 2006, and he personally made the decision to be admitted to MCV Hospital in order to receive the surgery and related medical services. MG ¶ 5. At the time of admission to MCV, Sanford executed the document marked as Deposition Exhibit 231 (T. Sanford Dep.). Specifically, the document states "I authorize and consent to healthcare services including, but not limited to, diagnostic procedures and medical treatment at and by the Medical College of Virginia Hospitals and Clinics . . . and MCV Physicians. TS p. 27-28, 34 (Exhibit 231).

Initially, his post-surgical hospital stay was uneventful; however, by December 22, he was hallucinating and combative. On that day, VCU PD officers were called because a patient was assaulting staff. RR ¶ 12. One of those officers was Conan Phelan ("Phelan"). CP ¶ 3. On arrival Phelan found Sanford in his room, no longer causing a problem. CP ¶ 4. A nurse identified Sanford as the person causing the disturbance. CP ¶ 5 She believed Sanford was under the influence of illegal substances. CP ¶ 5. This information was repeated to Phelan by a physician on scene. CP ¶ 8. Phelan determined that further intervention with Sanford, however, was unwarranted. CP ¶ 6. Phelan also encountered, Sanford's brother, Terry Sanford ("Administrator"). The nurse complained that the Administrator was being disruptive, CP ¶ 7, and that she believed he was the source of the drugs. CP ¶ 7. When the Administrator became disorderly, he was escorted

3

off the floor.  Phelan believes that the information about Sanford using drugs, and causing problems with staff, is information he would have passed on to his relief at shift change.  That information would be of interest to the officers on that shift in case they had to respond to Sanford's room again.  CP ¶ 9.

## B. The Events of December 24, 2006

During the day of December 23, 2006, Sanford began hallucinating and became violent. Jow. B. pp. 88-90. He reported seeing people that were not there. Jow. B. p.88-90. He had yanked his IV out and also removed his Foley catheter.  Jow. B. p. 91. During the late hours of the 23rd, Sanford became restless, Jow. B. pp.112-13, then agitated. Jow. B. p.113. By early morning December 24, Sanford was out of control.  He was hallucinating about non-existent blood on the floor, and was on the floor trying to wipe it up.  Jow. B. pp. 113-14.  Sanford was also insisting that he be allowed to leave his room.  Jow. B. p. 127.  He was also talking to a non-existent man. Jow. B.  p. 127.  He made repeated attempts to leave his room, tried to crawl under his bed, and crawled around the floor.  His care nurse, Jowanna Brown, ("Brown") describes his behavior as "off the wall." Jow. B. p. 127.  She tried to get Sanford back into bed and Sanford hit her. Jow. B. p. 127.  Brown at one point was able to get Sanford back in bed, and for a moment he appeared oriented, then just as quickly was not, Jow. B. p. 130, and resumed yelling that he had to leave. Jow. B. p. 130.  He got back on the floor, and when Brown approached him, he threw pillows at her, kicked at her, and tried to bite her. Jow. B. p. 114.  During this first incident, Sanford hit Brown several times. Jow. B. p.129.  Brown was scared for herself, as well as for Sanford. Jow. B. pp. 183, 227.

When she could no longer control Sanford, Brown got the attention of Patricia Ferguson ("Ferguson") another nurse on the floor. PF pp. 82-83. Ferguson assisted Brown in trying to restrain him to his bed using hospital restraints, but to no avail.[3] Jow. B. p. 114. During their attempts to restrain Sanford, he slapped and hit at them, and tried to pinch Brown. Jow. B. p. 131 Sanford was bizarre, "crazy belligerent . . . he wasn't there at all  . . . it was so much rage and anger. I've never seen anyone like this, never." Jow. B. p. 131; PF p. 82. During this time, Sanford continued to yell that he had to leave. Jow. B. p. 134. When Brown and Ferguson could not control Sanford, they backed off.

Sanford slid to the floor again, Jow. B. pp.115, 134; PF p. 84, once again darting around, trying to leave his room. As he moved he was scooting on his butt, and on his hands and knees. He attempted to crawl under his bed, and tried to get around the nurses to get to the door. He grabbed a metal trash can in the room and banged it on the floor. Jow. B. pp. 115, 135, 226-27. He grabbed a heavy chair that was in the room and shook it violently. Jow. B. pp. 115, 137, 226-27. While this occurred, Brown continued telling Sanford to calm down, to no avail. Jow. B. pp.115, 138. Based on Sanford's conduct, Brown was scared he was going to harm himself, her, or anybody else that was in the room. Jow. B. pp. 115, 138. She describes Sanford as a small man, but terribly strong. Jow. B. p.116.

In order to prevent Sanford from getting out of the room, Brown pulled a mattress from one of the beds and used it to try to pen Sanford into the corner of the room. Jow. B. p. 116. She told the other nurse to take the mattress from the other bed to form a wall to

---

[3] Each floor of the Hospital has vest and wrist restraints available. Wrist restraints can be used on a patient's ankles. A Posey vest is a jacket that is put on a patient to restrain them to a chair or bed. Restraints are used when a patient is a danger to themselves or others. Jow. B. pp. 22, 24, 26-28; PF pp.23-24, 44.

stop Sanford. Jow. B. pp. 116, 139. Together they tried to restrain Sanford so he could

not leave. Sanford meanwhile continued scooting about on the floor, trying to crawl

under the mattress and under the bed in an effort to escape. PF pp. 82-84. When he

approached the mattress, he grabbed it, shook it, and punched and kicked at it. He also

attempted to grab Brown, Jow. B. p. 116, tried to scratch her, and succeeded in hitting

and pinching her. Jow. B. pp. 141, 144. Sanford also spit on her. Jow. B. p. 126. Brown

used the mattress to keep Sanford safe as well as at bay. PF p. 140. During this time,

Sanford also grabbed and shook the footboard of his bed. Fearing he could remove it and

use it to harm himself or her, Brown removed it from Sanford's reach. Jow. B. pp. 116,

144-45. Sanford had such a high potential of harming himself, Jow. B. p. 151; PF p. 95,

that Security was called to hopefully get him back in bed. Jow. B. p. 151.[4]

### 1. The VCU PD and VCUHSA Security Response – Bailey and Lancaster

The nurses called for VCUHSA Security to respond. PF p. 49; Jow. B. pp. 37,

115, 138; RR ¶ 16. That call also went to VCU PD.[5] The call ordered officers to respond

to a "combative patient" on Main 11, Room 246B. MB ¶ 3; EP ¶ 3; AL ¶ 3; CB ¶ 4; RR

¶ 13. The call went out at 1:30:19 a.m.[6] RR¶ 13. In December 2006, a call to respond to

---

[4] Security is called when a patient is out of control, the nurses are unable to provide safety for the patient and the staff, and are unable to restrain the patient and gain control. Jow. B. p. 33.

[5] The VCU PD operates on a West Campus and East Campus. The East campus consists of the properties operated by the VCUHSA. AL¶ 2; CB ¶ 4; GW ¶ 3. VCU PD is tasked by statute with responding to Authority property and to calls such as this. *See* § 23-50.16:10, *Code of Virginia,* GW ¶ 21.

[6] The VCU PD maintains a record of incoming calls for assistance as well as transmissions made by dispatchers and police officers in response to calls for service. The log is kept in a modified military style, hour, minute, and second, format. The notation 1:30:19 represents 1:30:19 a.m. in the morning. RR ¶ 12.

a combative patient was understood by officers to mean someone had physically assaulted staff or others. MB ¶ 3; EP ¶ 3; AL¶ 3; CB ¶ 4.

Bailey of VCU PD, and Security Guard Supervisor Sammy Lancaster ("Lancaster") of VCUHSA were the first to respond. MB ¶ 5; SL p. 42; RR ¶ 13. Bailey was in uniform and wearing his badge of authority. MB ¶ 2. As Bailey ran down the hall from the elevators to the Nursing Station, a nurse frantically waved him into Sanford's room. MB ¶ 4; SL pp. 43, 46. Because of the apparent urgency, Bailey did not put on his latex gloves, which he normally wears in such situations.[7] MB ¶ 4. Bailey advised dispatch that he had arrived at the room at 1:33:11. RR ¶ 13. When he and Lancaster entered the room, they saw two nurses holding a mattress or mattresses in between them and Sanford.[8] MB ¶ 5. Sanford was on the other side of the mattress punching and kicking at the mattresses as if trying to hit and kick the nurses. MB ¶ 5. Sanford was acting "berserk." SL pp. 43, 44, 47, 102, 127, and threw a punch at a nurse, directed at her head. SL pp. 49-51, 53. The nurses looked to be holding the mattress to protect themselves, MB ¶ 5; SL pp. 60-64, while trying to verbally calm Sanford. SL pp. 59, 64.

Believing that it was necessary to get between Sanford and the nurses, Bailey determined Sanford was not armed, then asked the nurses to step back to let him

---

[7] VCU PD officers wear latex gloves in order to prevent infection from contagious diseases such as HIV. MB ¶ 4.

[8] Due to the chaotic nature of the events that morning and the passage of time, the participants' recollection of the number of mattresses used is slightly different at times. For example, Brown and Bailey recall two mattresses. MB ¶ 5; Jow. B. p. 116, others only recall one. PF p. 89; SL p. 60. For simplicity, this memorandum will refer to just one. Despite these and other minor inconsistencies, it is undisputed that Sanford was combative towards nurse Brown; at least one mattress was used to shield her from Sanford; there was at least one nurse in the room on the arrival of the officers and periodically while Sanford was handcuffed; Sanford was combative towards Bailey and Lancaster; and at least one nurse medicated Sanford while he was handcuffed and on the floor.

approach Sanford. MB ¶ 6; Jow. B. pp.117-18, 145-46  There was no time to provide

Bailey with any information about Sanford in light of what was going on. Jow. B. p. 186.

Bailey and Lancaster approached Sanford, MB ¶ 6, and he appeared to stop his hitting

and kicking momentarily. MB ¶ 6.  Bailey, was nevertheless concerned that he would

start fighting again in the next few moments.  MB ¶ 6.  Lancaster recalls that Sanford

never stopped kicking and hitting. SL pp. 65, 67, 69, 77, 79.  As they approached

Sanford, Bailey and Lancaster both talked to him. MB ¶ 7; SL pp. 43, 65, 75-76, 141,

146-47; Jow. B. p. 146-47.  They asked him questions and made comments to him

designed to calm him down so they could get him back in bed. MB ¶ 7; SL pp. 43, 75;

Jow. B. pp. 146-47.  They received no response. MB ¶ 7; SL pp. 43, 65.  Bailey made eye

contact with Sanford who appeared to be on street drugs. MB ¶ 12, Jow. B. p. 147.

Lancaster, describes Sanford as "geeked out on drugs." SL pp. 43, 44, 47, 102, 127.  In

the 13 years he has worked at the hospital, SL p. 7, he has never seen a patient act the

way Sanford did.  SL p. 43.

When Sanford did not respond, they leaned over to take hold of Sanford's arms –

Sanford was on his hands and knees on the floor – to lift him up to get him back into bed.

MB ¶ 7; SL pp. 85, 142.  They touched Sanford gently, MB ¶ 7; Jow. B. p. 148, one on

each side of Sanford, MB ¶ 7, while Lancaster continued talking to Sanford.  SL p. 142.

At their touch Sanford, immediately became combative. MB ¶ 8; SL p. 93; Jow. B.

pp.149-50.  He flailed his arms and kicked, MB ¶ 8, hitting Bailey, and kicking

Lancaster. MB ¶ 8; SL pp. 53, 68-70. The kick caused Lancaster to lose his balance and

8

fall backward. MB ¶ 8; SL p. 56. Bailey tried to hold onto Sanford,[9] MB ¶ 8, and Lancaster rejoined Bailey in the struggle. At this point, all three ended up on the floor. MB ¶ 8; SL p. 93; Jow. B. p.149. At some point, Lancaster's foot ended up on Sanford's chin. SL p. 56. Seeing this, Bailey immediately told Lancaster to remove it. SL pp. 43, 96, 108, 143. Sanford continued to hit and kick Bailey and Lancaster, Jow. B. p. 149. During the struggle Bailey was kicked up against the bed. MB ¶ 8. Lancaster meanwhile continued talking to Sanford to get him to calm down. SL pp. 91, 97.

In December 2006, Bailey weighed 265-270 lbs, MB ¶ 9, and Lancaster weighed approximately 170 lbs, SL¶ 10; MB ¶9. Sanford weighed 151 lbs. MB ¶ 9; WG p. 107, Am. Comp. Exhibit D. Bailey and Lancaster were nevertheless unable to control Sanford. MB ¶ 9. For a small man, Sanford had superhuman strength that night.

To try to stop him from fighting, Bailey tried a control/pain compliance hold on Sanford, without any effect.[10] MB ¶ 10. He also tried to restrain Sanford using his handcuffs so he would not hurt himself, Lancaster, or Bailey. He was only able to get one handcuff on Sanford's left wrist. MB ¶ 10. Unable to control Sanford, Bailey decided to hold onto him till help arrived. MB ¶ 13. He got on his radio and broadcast a 10-18 call for assistance. MB ¶ 11; EP ¶ 4; AL ¶ 4; CB ¶ 6; LC ¶ 3; RR ¶ 13. This is not a routine call, but one which asks for help in a hurry. MB ¶ 11; EP ¶ 4; AL ¶ 4; CB ¶ 6; LC ¶ 3. Bailey's 10-18 call was broadcast at 1:33:58, and heard by other officers. RR ¶ 13. They could tell from his voice that Bailey was in trouble. EP ¶ 4; AL ¶ 4; CB ¶ 6.

---

[9] Sanford's conduct towards the nurses and his fighting with Lancaster and Bailey constituted criminal offenses under Virginia law. MB ¶ 33.

[10] Such holds are taught to VCU PD officers as part of the "Continuum of Force" that they may employ in various situations. MB ¶ 10, GW ¶ 16. VCU PD officers are trained to use only that amount of force that is necessary to meet and overcome the force that is being exerted against them. MB ¶¶ 27-28.

Officers Pryor and Carter responded. EP ¶ 5; LC ¶ 4.  So did Corporal Branch and Officer LaVigne. AL ¶ 5; CB ¶ 7; RR ¶ 13.  Carter, Branch and LaVigne used the lights and sirens on their cars to speed to the Hospital.  AL ¶ 5; CB ¶ 7; LC ¶ 4.

### 2. The VCU PD Response – Pryor and Carter

Pryor and Carter arrived first.  VCU PD records reflect that both Pryor and Carter arrived at 1:35:12. RR ¶ 13.  On entry, the room was in disarray.  EP ¶ 6; PF pp. 204-05. They found Bailey, Lancaster and Sanford on the floor, with Bailey and Lancaster on either side of Sanford holding onto his arms. MB ¶ 13; EP ¶ 6; LC ¶ 5. Pryor asked Bailey how he could help, and was told they needed to handcuff Sanford.  MB ¶ 14; EP ¶ 7; LC ¶ 7.  Bailey also told Carter to watch Sanford because he was kicking. MB ¶ 14; LC ¶ 5.  Pryor moved in next to Sanford and Lancaster moved out of the way. EP ¶ 7; SL p. 97.  Sanford was face down on the floor, his right arm extended flat on the floor above his head, his left arm down by his side. MB ¶ 14; EP ¶ 7.  Since Sanford was trying to kick Bailey, Carter knelt on Sanford's calves to prevent Sanford's kicking. LC ¶ 16. In December 2006, Carter weighed approximately 140 lbs with all her equipment, yet Sanford was able to raise her off the ground with his legs, until only her toes were on the floor. LC ¶ 16.

While difficult, Sanford was handcuffed within a minute. EP ¶ 7.  Sanford was now handcuffed behind his back, face down on the floor. MB ¶ 14; EP ¶ 7.  At 1:36:51, Pryor broadcast over the radio that responding officers should slow their response, RR ¶ 3; EP ¶ 8; AL ¶ 5; CB ¶ 8, so that officers responding would not have an accident since the urgency of their response was no longer necessary. EP ¶ 8.  Sanford continued to struggle, though not as much as before. MB ¶ 14; EP ¶ 8.  Bailey and Pryor squatted

on either side of him and kept that position. MB ¶ 17; EP ¶ 8. They kept their hands on his back or shoulder with just enough contact to let Sanford know they were there and to stop Sanford from rising up if he turned combative again. MB ¶ 17. Pryor let Sanford know he was an officer and tried to calm him. EP ¶¶ 8, 10.

At this time, Ferguson asked the officers to keep Sanford in that position so she could start an IV. MB ¶ 17. She left the room, and on her return started an IV in Sanford's left arm. MB ¶ 18; EP ¶ 9; LC ¶ 8; Jow. B. pp.95, 120, 178-79, 201; PF p.113. Sanford was still alive at that point. PF p. 143. Carter and Pryor recall two syringes of liquid being administered into the IV. EP ¶ 9; LC ¶ 8.

### 3. The VCU PD Response – LaVigne and Branch

Shortly after the IV was started, Branch and LaVigne arrived. MB ¶ 18; EP ¶ 10; LC ¶ 15; RR ¶ 13. Branch was the supervisor for the shift. CB ¶ 3. On their arrival they too noticed that the room was in disarray. AL ¶ 6; CB ¶ 9. Branch also observed torn restraints on one of the beds, CB ¶ 11, and a nurse in the room who appeared to be very upset. CB ¶ 10. He knew that VCU PD officers had previously responded to Sanford's room because he was combative.[11] CB ¶ 15. Branch told a nurse that he believed stronger restraints were needed and asked the nurse for them. EP ¶ 10; CB ¶ 11. Branch saw Bailey, Carter and Pryor restraining Sanford on the floor. CB ¶ 10. He saw Sanford periodically spit and kick. CB ¶ 10. Since Bailey was out of breath, AL ¶ 7; CB ¶ 12, he ordered LaVigne to relieve him. MB ¶ 18; AL ¶ 7; CB ¶ 12. At some point, Branch relieved Pryor. MB ¶ 18; EP ¶ 11; CB ¶ 12. This let Bailey and Pryor walk around to stretch their legs and catch their his breath. MB ¶ 18; EP ¶ 11.

---

[11] The December 22, 2006, response by Phelan.

While Bailey and Pryor were up, Sanford continued to struggle, tried to lift his head and spit, and moved his legs. CB ¶ 12; AL ¶ 7.  LaVigne put his hand gently on Sanford's shoulder in case he made a move to get off the floor. AL ¶ 8.  Sanford was breathing, blinking his eyes, and moving around while they were next to him. CB ¶ 14; AL ¶ 8.  Meanwhile, Brown had called a doctor for medication to sedate Sanford, and 10 mg of Haldol was prescribed. Jow. B. pp. 119, 154-55, 176; PF p. 144.  Brown retrieved the drug, read about it since she was not familiar with how to dilute it or how fast to give it, and drew it into a syringe. PF p. 18.  Brown estimates that she was out of Sanford's room up to 10 minutes. Jow. B. pp. 120, 155.  She returned to the room and gave the Haldol through the IV. AL ¶ 8; CB ¶ 13.[12]  This took approximately three minutes. PF pp. 133, 205-06; Jow. B. pp. 120, 157, as Haldol is administered slowly. PF pp. 133, 205-06.  Once the Haldol was given, Brown told the officers to give the medication a few minutes to take effect and they could then put Sanford back in bed. Jow. B. pp. 121, 157, 160.

After the Haldol was given, Branch told LaVigne he he could return to his regular patrol duties. AL ¶ 9.  When LaVigne left, Sanford was breathing, blinking his eyes and moving around. AL ¶ 9.  Sanford then calmed down. CB ¶ 13.  Branch continued to monitor Sanford to make sure he would not become combative. CB ¶ 13.  He also monitored him for any signs of physical distress. CB ¶ 14. Ultimately, Pryor relieved Branch.

While in the room, Branch coordinated how to get Sanford back into bed.  Aware of the prior VCU PD response on December 22; the torn restraints on the bed and around

---

[12] LaVigne recalls that the IV was started at this time.  However, it is more likely that while Bailey and Pryor were kneeling next to Sanford that Ferguson started the IV; while Branch and LaVigne, on the other hand, were kneeling next to Sanford when Brown administered the Haldol.

Sanford's ankles; the intensity of the struggle between Bailey, Lancaster and Sanford; knowing from prior experience that medication given to a combative patient might not work the first time; CB¶15, he told Bailey to wait until the heavier restraints from the psychiatric ward arrived. Then Bailey should assist the nursing staff in returning Sanford to bed, and assist the staff in placing Sanford into those restraints. MB ¶19. Once that was done, Bailey could resume his normal patrol duties. CB¶17. When Branch left the room, he noted that Sanford appeared to be moving. CB¶ 14.

Bailey, Pryor, and Carter were now left in the room with Brown and Sanford. EP ¶ 14. They understood that once the heavier restraints arrived, they would be secured to Sanford by the nursing staff, and they would be free to leave. EP ¶ 14; MB ¶ 19; LC ¶ 12. Pryor was standing next to one side of Sanford, Bailey also standing, was on the other side of Sanford, MB ¶ 20, and Carter was standing at Sanford's feet. Carter was standing on the ends of the restraints that were attached to Sanford's ankles LC ¶¶ 6, 10, just in case Sanford became violent again. If that happened, she would be able to stop him from kicking anyone. LC ¶ 10. While he was on the floor, the three officers observed Sanford to make sure he would not become combative. MB ¶ 21; EP ¶ 20, LC ¶ 11. They also saw the rise and fall of his back as if he were breathing, and periodic movement of his hands. MB ¶ 21. He appeared to go to sleep. EP ¶ 15.

Meanwhile, Branch, who had also called for the clinical administrator or hospital administrator to come to the scene, met with that individual outside Sanford's room. [13]

---

[13] Lancaster recalls someone asking for him to call the clinical administrator and to call for restraints from the Psychiatric ward. SL pp. 99-100, 103-04. When he left the room to do so, LaVigne and Branch were in the room. SL p. 146. He went to the nursing station and called for restraints and the clinical administrator. SL pp. 44-45, 98, 103-04,

He and the administrator discussed the need for heavier restraints. CB ¶ 20. Branch then left the floor. Shortly after Branch's departure, since the restraints had not arrived, Pryor asked Brown if they could put Sanford into bed. He was advised by the nurses that they could. MB ¶ 22; EP ¶ 15; LC ¶ 12. When they rolled Sanford over to do so, they saw his lips were blue and he was not breathing. MB ¶ 22; EP ¶ 16; LC ¶ 13; Jow. B. p. 157. Bailey, Pryor, Carter and Brown immediately lifted Sanford into bed, removed the handcuffs, and began CPR. MB ¶ 23; EP ¶ 17; LC ¶ 13; Jow. B. pp. 159, 161. An Ambu bag was also obtained to ventilate Sanford. MB ¶ 23; EP ¶ 17; LC ¶ 113. After this was done, at 1:57:06, Bailey got on his radio and called for Branch to return to the room. MB ¶ 23; RR ¶ 13. From the time Sanford had been handcuffed, and Pryor had told officers to slow their response, to the time Branch was called back to the room, 20 minutes and 15 seconds elapsed.[14] RR ¶ 14. After continuing efforts to revive Sanford, a code blue was called. MB ¶ 24; EP ¶ 17; LC ¶ 13. At 1:59:51, Bailey relayed that on the radio. RR ¶ 13.

Branch meanwhile was leaving the hospital, but on hearing the call to return to the room, turned around to head back. CB ¶ 21. He feared that Sanford had become combative again. This had occurred on prior occasions with other patients he was involved with. CB ¶ 21. When he arrived, Pryor and Carter were performing CPR on Sanford. CB ¶ 22. When the code team arrived, he called Bailey, Pryor, and Carter out of the room. MB ¶ 25, CB ¶ 22.

From the time the Police Officer Defendants successfully handcuffed Sanford, to the time that he was rolled over and was found to be in distress, Sanford was kept in

---

107. Someone from the Psychiatric ward brought the restraints up to Main 11, but by that time Sanford had coded. SL p. 98.

[14] The officers uniformly indicate that the VCU PD log is the best evidence of the passage of time in this case. MB ¶ 26; EP ¶ 20; AL ¶ 11; CB ¶ 18; LC ¶ 14; RR ¶ 11.

handcuffs because the officers believed he was still a threat to the nursing staff, to the officers, and to himself. MB ¶ 29; EP ¶ 19; LC ¶ 16; AL ¶ 12; CB ¶ 16. No officer saw any indication that Sanford was suffering from any illness or other medical problem until Carter and Pryor turned Sanford over to lift him onto the bed. MB ¶ 30; EP ¶ 21; AL ¶ 13; CB ¶ 24; LC ¶ 17. None knew that Sanford had recently undergone surgery. MB ¶ 31, EP ¶ 22, AL ¶ 14; CB ¶ 25; LC ¶ 18, or that he was disabled physically or mentally. MB ¶ 32; EP ¶ 23; AL ¶ 15; CB ¶ 26; LC ¶ 19. None intended on arresting Sanford, MB ¶ 33; EP ¶ 24; AL ¶ 16; CB ¶ 27; LC ¶20 , nor did they intend to civilly commit him. MB ¶ 34; EP ¶ 25; AL ¶ 17; CB ¶ 28; LC ¶ 21. Their aim was to assist the staff in controlling Sanford so he could receive appropriate medical treatment. MB ¶ 33; EP ¶ 24; CB ¶ 27; LC ¶ 20; AL ¶ 16.

Because he had been combative with the nurses, Lancaster and Bailey, Sanford was handcuffed with his hands behind his back for safety reasons. MB ¶ 15. He was kept in handcuffs until heavier restraints were obtained from another part of the hospital. MB ¶ 16 Similarly, keeping Sanford face down on the floor was the best position for him so that he could not cause anyone else, or himself further harm. MB ¶ 16; AL ¶ 12; CB ¶ 16.

## C. Post December 24, 2006

An autopsy was conducted on Sanford. The medical examiner's ("ME's") Report of Autopsy lists Sanford's cause of death as "a lethal cardiac arrhythmia associated with his hallucinations, agitation, and restraint." Am. Comp. Exhibt D, p. 3; WG p. 8, 31-32. Dr. William Gormley ("Gormley"), the supervising pathologist at the autopsy, WG p. 12, reports that Sanford weighed 151 pounds. WG p. 107. He opines that there were no injuries found at autopsy that showed any physical injury to Sanford evidencing

excessive force on the part of responding officers. WG pp. 36, 72-73. Nor were there any

signs of Sanford having been asphyxiated, WG pp. 33-34, 72, during the struggle. He

also opines that while it is impossible to say when exactly the lethal cardiac arrhythmia

began, WG p. 98, though he believes it probably started when Sanford first demonstrated

signs of relaxing. WG pp.50, 58, 81. That would have occurred right after Sanford was

handcuffed or, at the latest, when the Haldol was given and he began to demonstrate what

would be the expected effects of Haldol. Gormley also opines that a person undergoing a

lethal cardiac arrhythmia could look to the observer to be breathing, could be seen to

move his hands and shoulders, and might even appear to relax or be sleeping. WG pp.81-

83. [15]

**D. Training received by VCU PD Officers**

VCUPD is accredited by the Commonwealth of Virginia Department of Criminal

Justice Services ("DCJS") as a Law Enforcement Agency. GW ¶ 4. VCU PD operates

its own Police Training Academy ("Academy") and trains its own recruits, as well as

those for other agencies. GW ¶ 5. DCJS has certified the Academy, VCU PD's policies

and procedures, as well as the training provided to its officers as adequate and

appropriate. GW ¶¶ 6, 8. The training provided by VCU PD is comprehensive and

includes, among many other subjects, Defensive Tactics and Comprehensive Crisis

Management ("CCM"). GW ¶¶ 7-11. Defensive Tactics includes training about the

Continuum of Force. GW ¶ 14. Handcuffing of subjects is also taught. GW ¶¶15-16.

Officers are trained to monitor handcuffed individuals to make sure they do not become

---

[15] Plaintiff's nursing expert Marlene Cooper opines that when Haldol is given, one
expects the patient to relax, become calmer and even go to sleep. MC pp.197-99. These
defendants acknowledge Ms. Cooper's expertise only to the extent that it relates to the
visible effects of Haldol on a patient.

combative, as well as making sure that are not in physical distress.  In that regard, they are to observe for breathing, that the subject is not struggling to breathe, and to look for signs of movement.  They also are trained to seek immediate medical care if any problem occurs. GW ¶ 20; CB ¶ 14.   CCM training includes how to interact with people who are on drugs or who have mental issues.  GW ¶¶ 9-11, 17, 14-16.  VCU PD's Policies and Procedures on the use of force are generic, and designed to apply in a wide variety of situations instead of specific ones.  GW ¶ 18.  They permit officers to use force on any individual who is assaulting a member of the public, including, if necessary, an assault by a mentally ill patient on health care staff.  GW ¶¶ 18 -19.  The main aim, in any application of force is to ensure that no one gets hurt. GW ¶¶ 19-20.  When dealing with individuals who are a danger to themselves or others, it would be impossible to train officers to respond in one way to one group of people, and another way with another group.  When it comes to exerting physical force, officer safety and the safety of the public and the individual involved calls for a uniform response. GW ¶¶ 13, 19.

**D. Chief Fuller**

Former Chief of Police Willie B. Fuller was on leave from the VCU PD from December 14, 2006 through and including January 2, 2007. Jen.B. ¶11-12.  Between January 1, 2001 and January 31, 2007, the Department responded in 7,662 cases in which restraints were used on patients.  There were only four instances in which a patient reported that they had been injured during such a response. Those injuries only involved minor cuts and bruises. Jen. B. ¶¶ 9-10.

## Argument

### IV.   STANDARD OF REVIEW

The award of summary judgment is proper where, as in this case, the movant establishes that there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if (1) there is a disputed fact, (2) the fact is material to the outcome of the case, and (3) the dispute is genuine; that is, a reasonable jury could return a verdict for either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When considering a motion for summary judgment, a court should construe all evidence in favor of the non-moving party. *Id.* at 247.

Where a defendant asserts qualified immunity, summary judgment should be granted if the defendant reasonably could have believed his actions were lawful. *Saucier v. Katz*, 533 U.S. 194, 213 (2001). It is not enough for plaintiff to dispute material facts unless such disputed facts call into question whether defendant reasonably could have believed his actions were lawful. One question is whether the official violated the Constitution at all. The second question is whether an affirmative answer to this question is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (quoting from *Anderson v. Creighton*, 483 U. S. 635 (1987)).[16]

---

[16] Under the test employed by the Supreme Court in *Saucier v. Katz*, courts were previously required to ask these questions in a two-step sequence. *See* 533 U.S. at 201. The first step was to determine if the defendant had violated the plaintiff's constitutional rights. Only if the answer to that first question was "yes" could the court then assess whether the right violated was a clearly established right of which a reasonable officer should have known. In *Pearson v. Callahan*, 129 S. Ct. 808 (2009), the Supreme Court held that this sequence is no longer mandatory. *See* 129 S. Ct. at 818. Rather, courts may

## COUNT 1

### OFFICER BAILEY'S ACTIONS IN SUBDUING SANFORD DID NOT CONSTITUTE EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT [17]

The undisputed facts in this case demonstrate that Sanford was a patient in the Hospital who was there voluntarily. Bailey and Lancaster responded to Sanford's room after being dispatched to the scene of a "combative patient." Bailey understood that call to mean that a patient had been assaulting staff. On arrival a nurse frantically waved them into Sanford's room. On entry they observed two nurses holding a mattress. On closer examination they observed Sanford, hitting and kicking at the nurses. They both concluded that Sanford was trying to hit/kick the nurses. After determining that he was unarmed, Bailey asked the nurses to step back and he and Lancaster stepped forward to engage Sanford in conversation. Despite efforts to talk to him, Sanford did not respond. When Bailey and Lancaster reached down to lift Sanford back into bed, Sanford hit Bailey and kicked Lancaster. Subsequently, Bailey, Lancaster and Sanford ended up on the floor struggling with Sanford and ultimately Sanford was handcuffed for everyone's protection.

At the outset, Bailey contends that the Fourth Amendment does not apply to this situation.[18] Even if the Fourth Amendment does apply, however, the circumstances in

---

"exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the particular circumstances of the case at hand." *Unus v. Kane*, 565 F.3d 103, 124 (4th Cir. 2009).

[17] Plaintiffs have moved to dismiss Pryor, Carter, LaVigne and Branch from Counts 1 and 3 of the Amended Complaint. Defendants Pryor, Carter, LaVigne and Branch will assume for this memorandum that this Court will grant that motion. If not, then these Defendants adopt the arguments raised by Bailey in Counts 1 and 3.

[18] "A 'voluntarily confined individual who is bodily restrained by State actors, **related to his consented-to medical treatment,** has not been seized for purposes of the Fourth

this case do not establish a Fourth Amendment violation. The Fourth Amendment provides protection against excessive force during arrest. *Graham v. Connor*, 490 U.S. 386 (1989). All claims of excessive force during investigatory stops or arrests or other seizures are governed by the Fourth Amendment's "objective reasonableness" standard. *Id.* "An officer's actions are not excessive if they "are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id; Waller v. City of Danville*, 212 Fed. Appx. 162, 169 (4th Cir. 2006). "With respect to the force used in these confrontations, it is important to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Bates v. Chesterfield County*, 216 F.3d 367, 372 (4th Cir. 2000). Moreover, because "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation . . . the reasonableness of the force used is assessed from the perspective of a reasonable officer on the scene, rather than the perspective of one with the benefit of hindsight. *Graham,* 490 U.S. at 396-97. "Finally, because many of the situations officers face in the course of their duties are ambiguous, the court must allow for reasonable mistakes." *Id.* at

---

Amendment's application so long as a reasonable person in the patient's position would believe that he was free to leave the State's care." (Citation omitted). If, however, a reasonable person in the patient's position would believe that the physical restraint was not medical treatment, but rather an attempt by the State to transform the voluntary care relationship into involuntary confinement, then the patient has been seized within the meaning of the Fourth Amendment and its standard applies." *Lanman v. Hinson*, 529 F.3d 673, 681 (6th Cir. Mich. 2008)(Emphasis added). Whether the unique events here constitute a seizure under the Fourth Amendment, or a situation covered by the Fourteenth Amendment, by whichever standard applies, neither constitutional provision was violated.

396. *See also Schultz v. Braga*, 455 F.3d 470, 478 (4th Cir. 2006).

### 1. From time of entry to reaching down to touch Sanford to pick him up

It is beyond dispute that Bailey's acts of entering Sanford's hospital room, approaching Sanford, and simply talking to him, did not implicate the proscriptions of the Fourth Amendment. Even in the instant when Bailey reached down to help Sanford up off the floor, but before he actually came in contact with Sanford, the Fourth Amendment was not in play. Up to this point, there was simply no Fourth Amendment seizure, nor did Bailey's conduct rise to the level of excessive force [19]

### 2. From first touch to handcuffing

As noted by the Supreme Court, "[n]ot every push or shove [or touch]. . . violates the Fourth Amendment. *Graham,* 490 U.S. at 97. Similarly, there is no support for the contention that "whenever a law enforcement officer touches a person who is not under

---

[19] It is undisputed that Bailey had no intention of arresting Sanford, and every intention of getting him back in bed. Nevertheless he had information about a criminal assault prior to his arrival on scene, and Sanford's possible involvement. He was therefore authorized in conducting an investigation of what had occurred, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). If necessary, he could have also detained Sanford temporarily for that purpose. "A brief but complete restriction of liberty is valid under *Terry*." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). Moreover, "[a]s a general rule, officers conducting a *Terry* stop are authorized to 'take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *United States v. Singleton*, 2008 U.S. Dist. LEXIS 42368 (W.D.N.C. May 29, 2008). Such steps include "drawing weapons, **handcuffing a suspect**. . ." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007)(Emphasis added). Consequently, Bailey's act of placing his hand on Sanford's shoulder to help lift him up off the ground, was authorized, whether or not he intended such an investigation. In addition, Bailey also had probable cause to arrest Sanford for the assault on the nurses committed in Bailey's presence as he entered the room. "Probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. N.C. 2009). Consequently, Bailey's touching of Sanford at this point was authorized under the law, regardless of any intent to arrest.

arrest the amount of force is thereby per se 'excessive . . .," *Martin v. Mendoza*, 230 F.

Supp. 2d 665, 672 (D. Md. 2002). At the moment that Bailey touched Sanford, the

evidence is uncontroverted that it was gentle, and intended to lift him up and to help him

back into his bed. This too did not amount to a violation of the Fourth Amendment either

in the context of a seizure, or excessive force.

The evidence is also undisputed, however, that once Bailey touched Sanford to lift

him up, Sanford reacted by hitting Bailey and kicking Lancaster. At that moment, as a

sworn Police Officer, Bailey was authorized, if not mandated, to stop the assault. In fact,

Bailey then had probable cause to arrest Sanford for felony battery of a Police Officer

and misdemeanor battery of Lancaster. Once again, however, Bailey had no intention of

doing so. His aim was to help Sanford, not arrest him. Having said as much, however,

that does not mean that he should not have attempted to control Sanford, and when hands

on control failed, to use that same amount of force that he would have been  entitled to

use in an ordinary arrest situation. *Corbin v. Woolums*, 2008 U.S. Dist. LEXIS 95977,

23-25 (E.D. Va. Nov. 25, 2008)(Where Officer's decision to arrest based on probable

cause is objectively reasonable "handcuffing the arrestee does not constitute unreasonable

force). Significantly, according to the Medical Examiner, there is no evidence of trauma

to Sanford indicating police brutality during this event. In fact, during the struggle with

Sanford, Bailey told Lancaster to remove Lancaster's foot from Sanford's chin area so

that Sanford would not be injured.   All told, Bailey's conduct during this period of time,

was beyond reproach and fell squarely within the expectations of the Fourth Amendment.

### 3.  <u>From handcuffing to the determination that Sanford was in distress</u>

Even after Sanford was handcuffed, he continued to struggle, to spit, and to

demonstrate that the fight was not out of him.  While he became less combative over

time, Bailey and the other officers present recognized the situation was volatile and could

change in an instant.  It was not unreasonable for Bailey to believe that Sanford continued

to pose a threat to the officers on scene, to the nurses, and to himself.  As noted by the

Fourth Circuit:

> Proper application of the test of reasonableness also 'requires careful
> attention to the facts and circumstances of each particular case, including
> the severity of the crime at issue, **whether the suspect poses an
> immediate threat to the safety of the officers or others, and whether
> he is actively resisting** arrest or attempting to evade arrest by flight." . . .
> Ultimately, "the question is 'whether the totality of the circumstances
> justifie[s] a particular sort of . . . seizure.'"

*Waller v. City of Danville,* 212 Fed. Appx. at 169 (Citations omitted)(Emphasis added).

It is undisputed, that not one of the responding Police Officers, least of all Bailey, knew

Sanford was post surgical, or that he was physically or mentally disabled.  The question

is not what he should have known, the question is what he did know.  What Bailey knew

was that Sanford was out of control, possibly on drugs, had attacked his nurses, and had

then successfully fought with Lancaster and him until reinforcements arrived.  As noted

by the Fourth Circuit in *Bates v. Chesterfield County,* 216 F.3d at 372, a case involving

police interaction with an autistic subject:

> In light of Bates' previous resistance to police -- his scratching, spitting,
> biting, and kicking -- the officers acted reasonably by forcibly restraining
> him.  **Knowledge of a person's disability simply cannot foreclose
> officers from protecting themselves, the disabled person, and the
> general public when faced with threatening conduct by the disabled
> individual.** We do not underestimate the difficulties that an autistic
> individual may face in dealing with law enforcement officers.  **At the same**

23

**time, that fact cannot set aside an officer's responsibility to uphold the law and ensure public safety.** (Emphasis added).

Since Bailey was authorized at this juncture to detain Sanford, even arrest him for his assaultive behavior, restraining him for the limited purpose of protecting Sanford and those around him from harm was not an unlawful seizure under the Fourth Amendment. Further, maintaining him in handcuffs for approximately 20 minutes, for purposes of medicating him, and obtaining stronger restraints prior to putting him back in bed and removing the handcuffs, under the facts and circumstances of this case, was not unreasonable or excessive under the strictures of the Fourth Amendment.[20]  The Fourth Amendment was not violated.

### 4.     Bailey is Entitled To Qualified Immunity

Assuming, arguendo, that the court finds that a question of fact exists to establish a violation of the Fourth Amendment, then Bailey is nevertheless entitled to qualified immunity as is discussed *infra*.[21]

### COUNT 2

### THE POLICE OFFICER DEFENDANTS' CONDUCT DID NOT CONSTITUTE A DEPRIVATION OF LIFE IN VIOLATION OF THE FOURTEENTH AMENDMENT

### 1.     The Due Process Clause Does Not Replace State Tort Law

---

[20]*Chin v. Wilhelm*, 2006 U.S. Dist. LEXIS 13101 (D. Md. Mar. 24, 2006)(Excessive force not present where subject handcuffed from 15 minutes according to officer, to six hours according to Plaintiff); *McCall v. Williams*, 52 F. Supp. 2d 611, 614 (D.S.C. 1999)(Qualified immunity appropriate for officer who kept handcuffs on subject for fifteen to twenty minutes.)

[21] Fuller and the Police Officer Defendants contend that they are also entitled to qualified immunity as to each count of this case.  For brevity's sake, they will not repeat this argument after each count, but will address this argument at one time.

The Due Process Clause of the Fourteenth Amendment does not automatically impose liability when a person "cloaked with state authority causes harm." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Claims should be rejected when the due process clause is used to impose federal duties that are analogous to those traditionally imposed by state tort law. *Collins v. City of Harker Heights*, 503 U.S. 115, 128-29 (1992). "Our Constitution…does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams* , 474 U.S. 327, 332 (1986)  The due process clause applies only to the most egregious official conduct and "was intended to prevent government from abusing its power or employing it as an instrument of oppression." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 196 (1989); *see also Waybright v. Frederick County*, 528 F.3d 199, 205 (4th Cir. 2008).

The Fourth Circuit has cautioned its judges to use restraint in applying the due process clause.

> As to negligently inflicted harm, it is categorically beneath the threshold of constitutional due process. And as to culpability falling within the middle range, following from something more than negligence but less than intentional conduct, the Court has allowed that it may have constitutional implications, but only in special circumstances. As to what those special circumstances are, the Court has issued no general rule except that judges should proceed with self-restraint and utmost care and make an exact analysis of the circumstances presented before any abuse of power is condemned as conscience shocking.

*Waybrigh,t* 528 F.3d at 205 (citations omitted)

Stated another way, "where a claim sounds both in state tort law and substantive due process, state tort law is the rule and due process is the distinct exception." *Id.* A strong presumption exists that a Section 1983 due process claim such as this one, should be rejected when a plaintiff's due process claim overlaps state tort law. *Id.* Such a

25

presumption can only be overcome if it can be shown that the police officers' conduct

was so "arbitrary and egregious that it shocks the conscience, usually because a [police

officer] intended harm without justification. *Id.*

### 2. The Police Officers' Conduct Was Not Intentional And Does Not Shock the Conscience

Official conduct must "shock[ ] the conscience, and nothing less." *Lewis,* 523

U.S. at 846. The shocks the conscience test turns on degree of fault; a successful claim

must show that the action taken by the police officers was "intended to injure in some

way unjustifiable by any government interest." *Id.* at 849; *see also Waybright,* 528 F.3d

at 205.

Only governmental conduct that "shocks the conscience" is actionable as a

violation of the Fourteenth Amendment. *Lewis,* 523 U.S. at 846. As the Supreme Court

recognized in *Lewis,* however, determining whether conduct is sufficiently egregious to

amount to a Fourteenth Amendment violation is far from an exact science. *Id.,* at 847

("While the measure of what is conscience-shocking is no calibrated yard stick, it

does . . . point the way." (internal quotations marks and alterations omitted)). *Waybright,*

528 F.3d at 205. Depending on the circumstances, different degrees of fault may rise to

the level of conscience shocking. *See Miller v. City of Philadelphia*, 174 F.3d 368, 375

(3d Cir. 1999) ("The exact degree of wrongfulness necessary to reach the 'conscience-

shocking' level depends upon the circumstances of a particular case.").

Importantly, the conduct of the Police Officer Defendants does not rise to the

arbitrary and egregious level to shock the conscience. In this case, these officers were

called to the hospital to assist in subduing Sanford, who had become combative and,

according to undisputed testimony, exhibited "superhuman" strength. As an example, of

this strength, Sanford rendered useless the normal hospital restraints, was able to successfully battle Bailey and Lancaster who had a combined weight of approximately 435 pounds, and was able to lift Carter, who weighed an additional 140 pounds, off the floor by the use of his legs. Moreover, there is simply no evidence that these officers intended any harm to Sanford, or that punishing Sanford in any fashion ever entered their minds. Nor did they deny him the medical attention he required. They simply tried to protect Sanford from himself, and hospital personnel and themselves, from Sanford.

In fact, the evidence is undisputed that rather than dealing with Sanford with hostile intent, they acted quite the opposite. Bailey attempted to calm Sanford down by talking to him prior to the struggle ever taking place. When engaged in the struggle which Sanford initiated, he cautioned Lancaster to take his foot off Sanford's chin so as not to injure Sanford in any way. Furthermore, when the wrist lock hold failed to have any effect, rather than escalating up the Continuum and using more severe force, he chose instead to hang on and call for assistance. In addition, all the Defendants cooperated with the nursing staff and kept Sanford restrained so that Ferguson could start and IV. They then permitted Brown to medicate Sanford with the Haldol. During these events Pryor talked to Sanford while he was handcuffed, assuring him that he was there and that they would get through the situation. Finally it was Pryor and Carter who commenced CPR and ventilation on Sanford. These acts do not demonstrate evidence of an intent to punish.

Significantly, the autopsy report reveals no traumatic injury to Sanford that could have come from police misconduct. During the time that he was handcuffed, two nurses ministered to Sanford, the officers noted he appeared to be breathing and moving, and he

ultimately was seen to go to sleep -- an expected effect of Haldol.  Perhaps one could find

that these officers should have paid closer attention to Sanford's breathing and perhaps

acted sooner.[22]  That conduct, however, is at worst negligence.  Such omissions do not

implicate the due process clause.  An intentional or deliberate denial of life is required

not a mere failure to take reasonable care.  *Carter v. Baltimore County*, 95 Fed. Appx.

471, 476 (4th Cir. 2004)  No evidence suggests any intention to kill or injure Sanford.

The Fourteenth Amendment was not violated.

### COUNT 3

### SANFORD WAS NOT A PRETRIAL DETAINEE AND BAILEY'S ACTIONS DID NOT CONSTITUTE EXCESSIVE FORCE IN VIOLATION OF THE FOURTEENTH AMENDMENT

### 1.    Sanford Was Not A Pretrial Detainee

Here plaintiff baldly asserts that Sanford was a pretrial detainee.  Only after the

state has taken custody of a person does the due process clause impose certain affirmative

obligations on the state.  *DeShaney*, 489 U.S. at 195.  "[O]ne lawfully arrested and being

held prior to a formal adjudication of guilt . . . is adjudged in our circuit to be a pretrial

detainee." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997).  Here the evidence is

undisputed that Sanford voluntarily entered a public hospital for surgery.  He consented

to be there.  Furthermore, Bailey's actions, were not intended to place Sanford under

arrest, or to involuntarily commit him, rather, they were intended to facilitate medical

treatment.  Sanford was therefore not a prisoner, arrestee or an involuntarily committed

---

[22] It is doubtful that would have made a difference.  As Doctor Gormley observes, he would not expect Police Officers to recognize, let alone react to the unique and observable breathing pattern that a person in a lethal cardiac arrhythmia might demonstrate.  "[T]he difference between agonal breathing and breathing breathing." WG ¶ 98.

28

patient, nor was there ever any intent by Bailey to place him into that status. Accordingly, Sanford is not a pretrial detainee.

### 2. The Police Officers conduct did not amount to Excessive Force

Moreover, even assuming *arguendo*, that Sanford was a pre-trial detainee, the evidence is undisputed, that at no time did Bailey take any action that could be construed as intended to punish. For excessive force to apply as to a pre-trial detainee, "the use of force must have been intended as punishment." *United States* v. *Cobb,* 905 F.2d 784, 788 (4th Cir. 1990). "[T] he plaintiff must show that the [Defendant] 'inflicted unnecessary and wanton pain and suffering'" *Whitley v. Albers*, 475 U.S. 312, 320 (1986). "In this regard, '[t]he proper inquiry is whether the force applied was '[] a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998).

The Fourteenth Amendment was not violated.

## COUNT 4

**SANFORD WAS NOT A PRETRIAL DETAINEE AND THE POLICE OFFICER DEFENDANTS' CONDUCT DID NOT AMOUNT TO A DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS IN VIOLATION OF THE FOURTEENTH AMENDMENT**

### 1. Sanford Was Not A Pretrial Detainee

For the reasons previously stated, Sanford was not a pretrial detainee.

### 2. The Police Officer Defendants were not deliberately indifferent to Sanford's medical needs

As noted by the Fourth Circuit in *Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir. Va. 2004):

> Deliberate indifference is a very high standard . . a showing of mere negligence will not meet it . . . deliberate indifference requires a showing

that the defendants actually knew of and ignored a . . . serious need for medical care.

In *Estate of Hezekiah Harvey v. Roanoke City Sheriff's Office*, 585 F. Supp. 2d 844 (W.D. Va. 2008), a pretrial detainee became combative, throwing and smearing his feces around his cell, biting an officer and refusing to take his anti psychotic medication while incarcerated in jail. A decision was made to transfer him to a hospital; he was transferred to the hospital naked, wet and agitated with a blanket over his head while he continued to kick scream and spit. The detainee went into cardiac arrest and died from excited delirium and congestive cardiomyopathy.

In *Harvey*, a clear pretrial detainee case unlike the case here, the court awarded summary judgment and held that the deliberate indifference claim failed because no evidence existed that the officers knew of and disregarded a serious need for medical care and any alleged negligence was insufficient to establish a constitutional violation. *Id*. at 856-57.

In the instant case, not one of the Police Officer Defendants knew that Sanford had recently undergone surgery, or that he was disabled physically or mentally. When Bailey, Pryor and Carter were finally able to control Sanford, they permitted Ferguson to minister to him and to start an IV. A number of minutes later, with Branch and LaVigne present, Brown returned and administered Haldol to Sanford over a period of approximately 3 minutes. During the time that Sanford was restrained, the officers watched his breathing, observed him for movement, and did not observe any indication that he was in distress. In fact he appeared to relax following the administration of the Haldol, as one would expect a person to do who has been sedated. Not one of them could possibly have known that Sanford was experiencing a lethal cardiac arrhythmia.

Furthermore, during this time, Branch arranged to get heavier restraints for Sanford, in order to return him to his bed for ongoing treatment by the nursing staff. When Sanford was discovered not to be breathing, Bailey, Pryor and Carter, who were the only officers in the room at the time, acted quickly. They lifted him onto the bed, removed his handcuffs, and began CPR and ventilations.

These facts demonstrate clearly that there was no deliberate indifference to any of Sanford's known medical needs. The Fourth Circuit has made clear that "the question in deliberate indifference cases is not whether the officials could have taken additional precautions - almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have been taken - but whether they disregarded an excessive risk to . . . [a detainee's] health or safety." *Parrish*, 372 F.3d at 309. In addition, the Fourth Circuit has held that non-medical officials, like these police officers, are entitled to rely on the professional judgment and expertise of trained medical personnel. *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990); *see also Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Harvey*, 585 F. Supp. 2d at 857. To establish a claim for deliberate indifference against these non-medical officers, a plaintiff must show that they were personally involved with the denial of treatment, and that they deliberately interfered with the medical treatment. *Id*. at 853. The unrefuted evidence is that this did not happen. Rather, these Defendants cooperated with, and assisted the nursing staff in trying to care for Sanford.

The Fourteenth Amendment was not violated.

## COUNT 6

**SANFORD WAS NOT AN INVOLUNTARILY COMMITTED PERSON; THE POLICE OFFICER DEFENDANTS' CONDUCT S DID NOT CONSTITUTE EXCESSIVE FORCE IN VIOLATION OF THE FOURTEENTH AMENDMENT[23]**

### 1.    Sanford was not an Involuntarily Committed Person

Virginia law provides a detailed process by which an individual can be civilly

committed. § 37.1-67.01 *et seq., Code of Virginia.* The evidence is clear, however, that

the procedures for civil commitment were never initiated on December 24, 2006. The

evidence is also undisputed that none of the Police Officer Defendants, nor any of the

nursing staff, intended to civilly commit Sanford. Rather, as noted earlier, the intent of

the Police Officer Defendants was to restrain Sanford so that they could get him back in

his bed so the nursing staff could provide him with medical care. Accordingly, Sanford

is not a civilly committed individual.

### 2.    The Police Officers conduct did not amount to Excessive Force

For the reasons previously articulated, the Fourteenth Amendment was not

violated.

---

[23] On motion of the Plaintiffs, and by order of this Court, Count Six was dismissed "insofar as it incorporates Count 5 by reference." (Docket No. 119, August 4, 2009). Count 5 appeared to be an equal protection claim by a pre-trial detainee. According to Plaintiffs' counsel, Count 6 should now be interpreted to be an excessive force claim and deliberate indifference to medical needs claim by an involuntarily committed person. While concurring that Count 6 appears to state an excessive force claim by an involuntarily committed person, Defendants disagree that it states a deliberate indifference claim. To that extent, these Defendants shall not address the equal protection component and deliberate indifference claims of Count 6. Should the Court disagree with the Defendants' assessment, they incorporate by reference the co-defendants' memorandum on this count as it relates to the equal protection claim. Similarly, they incorporate their prior arguments as to Count 4.

## COUNT 8

## THE CONDUCT OF THE POLICE OFFICER DEFENDANTS DID NOT CONSTITUTE A CIVIL CONSPIRACY

### 1. Conspiracy Actionable under § 1983

To state a claim for conspiracy to deprive an individual of a constitutional right in violation of § 1983, Plaintiff must allege that defendants (1) "acted jointly in concert" and (2) performed an overt act (3) "in furtherance of the conspiracy" that (4) resulted in the deprivation of a constitutional right. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (internal citations omitted)

### a. Acted Jointly in Concert

Conspiracy necessitates a meeting of the minds of conspirators, *Murdaugh. Volkswagon Inc. v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir. 1981), a unity of purpose, *American Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946), and arrival at an agreement upon the plan to proceed, *Ballinger v. North Carolina Agricultural Extension Services*, 815 F.2d 1001, 1006-07 (4th Cir. 1987). The fact that police officers seeking to make an arrest conferred at the scene among themselves and with others does not reveal a conspiracy. *See Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994); *Smith v. McCarthy*, 2009 U.S. Dist. LEXIS 746, *55 (W.D. Va. Jan. 7, 2009). "If the facts...show that [Defendants] arrived on the scene to encounter an unfamiliar suspect resisting arrest, it will be difficult for Plaintiff to maintain a conspiracy claim against them." *Harrison v. Prince William County Police Dep't*, 2009 U.S. Dist. LEXIS 10223, *34 (E.D. Va. Feb. 10, 2009). Conspiracy requires proof that the Defendants "shared the same conspiratorial objective." *Id.* at *33. Conspiracy is unproven where individual responders to a crisis are suddenly compelled to make life-saving decisions without

aforethought. Conspiracy necessitates planning, collusion and connivance – all absent here.

### b. Performed an Overt Act

The occurrence of an overt act is required for a conspiracy. *See United States v. Schell*, 775 F.2d 559, 568 (4th Cir. 1985). Conspiracy is not demonstrated by continued discussion or collective planning, but requires overt acts from which injury actually flows. *Kadar Corp. v. Milbury*, 549 F.2d 230, 234 (1st Cir. 1977). Defendants must have acted "without authority of law . . . not justified or warranted by law." *See* 4A Michie's Jurisprudence, Conspiracy § 3. Certainly "there can be no conspiracy to do what the law allows." *Smith v. McCarthy*, 2009 U.S. LEXIS 746, *55 (W.D. Va. 2009).

### c   In Furtherance of the Conspiracy

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Black v. Wade*, 1997 U.S. App. LEXIS 29797, 29797 (4th Cir. Va. Oct. 28, 1997).

### d. Resulting in Deprivation of a Constitutional Right

Absent a conspiracy, the acts of Defendants were not the sole proximate cause of a deprivation of liberty or life, *see DeShaney*, 489 U.S. at 201.

### e. Intra-corporate Immunity Doctrine

A conspiracy presumes the involvement of two or more persons, not agents of the same corporation or institution. *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985) ("the acts of the agent are the acts of the corporation."). The officers and agents of a single institution are legally incapable of conspiring together. Public entities are entitled

to intra-corporate immunity when the alleged conspirators are fellow employees. *Zombro v. Baltimore City Police Dep't.*, 868 F.2d 1364, 1371 (4th Cir. 1989) (observing that the Baltimore City Police Department, even if it were a person, "may not conspire with itself"). *See also Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974); *Buschi v. Kirven*, 775 F.2d at 1251 (applied to dismiss a claim against the Virginia Governor and state officials at various levels).

At the outset, there are only a few statements made from the time of Bailey and Lancaster's arrival, to the time that Sanford was turned over, and which could demonstrate agreement or joint action. On arrival, 1) Bailey asked the nurses if Sanford was armed; 2) he was told that he was not; 3) during the struggle, Bailey told Lancaster to remove his foot from Sanford's chin area; 4) on arrival, Pryor asked Bailey what he could do; 5) Bailey told him they had to handcuff Sanford; 6) Bailey also told Carter to watch out that Sanford was kicking; 7) Ferguson asked if the officers would hold Sanford so that she could start an IV; 8) on giving the Haldol, Brown commented that Sanford should quiet down in a couple of minutes and could then be moved; and finally, 9) Pryor asked Brown if Sanford could be moved back to bed. None of these statements, either individually, or collectively, demonstrate any agreement by any of the Defendants "to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Black v. Wade*, 1997 U.S. App. LEXIS 29797, 29797 (4th Cir. Va. Oct. 28, 1997).

Rather, the facts and the statements demonstrate the opposite. The intent of everyone involved was to control Sanford, and to do so for purposes of rendering medical treatment.

Moreover, absent a conspiracy, whatever harm befell Sanford cannot be attributed to any conspiratorial motive, or agreement. Consequently, the injury sustained does not have the conspiracy itself as its proximate cause.

Finally, VCUHSA was created as a "public body corporate and as a political subdivision of the Commonwealth." § 23-50.16:10, *Code of Virginia*. Virginia Commonwealth University in turn, is an agency of the Commonwealth. § 23-50.4 *Code of Virginia*. Pursuant to § 23-50.16:10, *Code of Virginia*, [VCU PD], "[t]he campus police department of Virginia Commonwealth University . . . may enforce on Authority property the laws of the Commonwealth and rules and regulations adopted pursuant to subsection A of this section." Both entities are arms of the Commonwealth. Pursuant to the holding in *Buschi v. Kirven*, 775 F.2d at 1251, any concerted action by the Police Officer Defendants in this case with employees of the VCUHSA, is simply concerted action by the same entity. Based on the forgoing, there was no civil conspiracy.

## COUNT 9

### C.  FULLER DID NOT FAIL TO MEET HIS CONSTITUTIONAL OBLIGATIONS TO PROPERLY TRAIN HIS SUBORDINATES, AND THERE WAS NO CONSTITUTIONAL VIOLATION WHICH CAN BE LINKED TO SUCH FAILURE

#### 1.  The failure to train

A failure to train claim has three elements: 1) an actual violation of a person's constitutional rights; 2) a showing that the Defendant failed to properly train subordinates in a way that demonstrates a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and 3) the failure to train caused the constitutional violation." *Johnson v. City of Richmond*, 2005 U.S. Dist. LEXIS 36960

(E.D. Va. June 24, 2005).  As noted in *Guerra v. Montgomery County*, 118 Fed. Appx.

673, 676 (4th Cir. 2004)

> It will not "suffice to prove that an injury or accident could have been
> avoided if an officer had had better or more training, sufficient to equip
> him to avoid the particular injury-causing conduct. Such a claim could be
> made about almost any encounter resulting in injury, yet not condemn the
> adequacy of the program to enable officers to respond properly to the
> usual and recurring situations with which they must deal. And plainly,
> adequately trained officers occasionally make mistakes; the fact that they
> do says little about the training program or the legal basis for holding the
> [defendant] liable.

### a.     Actual violation of constitutional rights

Sanford died after a struggle with the Police Officer Defendants because he first

assaulted the nursing staff, then assaulted Bailey and Lancaster.  He continued to struggle

until he could be handcuffed.  Even then he exhibited signs that caused the Police Officer

Defendants to be concerned that he might resume his combative behavior.  They kept him

handcuffed and prone for everyone's safety, while permitting medical attention and

waiting for stronger restraints with which to restrain Sanford to his bed.  These facts do

not rise to the level of a constitutional violation.  The first prong of a "failure to train"

case is therefore unfulfilled.

### b.     Deliberate Indifference

The second prong requires evidence that Fuller was "aware of, and acquiesced in,

a *pattern of constitutional violations*." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 703 (E.D.

Va. 2004).  (quoting *Lytle v. Doyle*, 326 F.3d 463, 474 (4th Cir. 2003)).  Plaintiffs may

also demonstrate that "in light of the duties assigned to . . . employees the need for more

or different training is *so obvious*, and the inadequacy *so likely* to result in the violation of

constitutional rights." *City of Canton*, 489 U.S. at 390 (emphasis added).

Here, Captain Warren's affidavit sets out the training that prospective VCU PD officers receive; the additional field training they undergo on graduation; and that ongoing training once they assume their duties is required to keep their qualifications and to enhance their skills. The breadth of training is great, including Defensive Tactics, which includes the use of force, and Comprehensive Crisis Management ("CCM"), a course providing insight into how to deal with persons on drugs or suffering mental issues. Significantly, no evidence shows any prior significant injuries or death caused by VCUPD Officers in their response to the Authority's hospitals or clinics and involving their interactions with the patient population. In fact, the evidence is to the contrary. Of approximately 7,660 responses to Authority property between 2001 and 2007, only four cases resulted in any injury to anyone, and those injuries were classified as minor cuts and bruises.[24] No one could reasonably conclude from these statistics that there existed a "pattern of constitutional violations."

Moreover, in 2006, based on these numbers alone, it was not obvious that more training was required for officers responding to the hospitals and clinics, and it certainly was not likely that this lack of training would result in a constitutional violation. One cannot forget why VCU PD officers are called to these disturbances. As noted by Captain Warren, "we are there because hospital staff needs assistance with a situation that **they could not handle**." GW ¶ 23 (Emphasis added). They are called to deal with combative patients, and to resolve the situation. At that point hospital staff will dictate

---

[24] Moreover, and contrary to Plaintiffs' assertions in the Amended Complaint, Fuller who was on leave for the later half of December 2006, could not have known of the December 22 incident involving Sanford and Officer Phelan. Even assuming that the incident rose to the level of a constitutional violation, which it did not, any notice to Fuller about that situation would have been irrelevant.

what happens to the patient. VCU PD officer training was more than adequate for the task.

**c.     The failure to train caused the constitutional violation.**

No amount of additional training would have prevented Sanford's death, and Plaintiffs cannot identify any specific training, or lack thereof, that would have made a difference. At the end of the day, it is beyond question that Sanford had to be restrained. It did not matter that he was a patient or disabled. That legitimate restraint, in and of itself, brought on his lethal cardiac arrhythmia. As Dr. Gormley opines, while it is impossible to say when exactly the lethal cardiac arrhythmia began, he believes it probably started when Sanford first demonstrated signs of relaxing. That in turn would have occurred right after Sanford was handcuffed or, at the latest, when the Haldol was given and he began to demonstrate what would be the expected effects of Haldol.[25] Until that moment, the Police Officer's actions in gaining control of Sanford, and keeping him controlled so he could be medicated, were steps born of the training they had received, and could not have been improved upon so as to make any material difference. That training, dealing with how to handle combative individuals of every stripe, was more than adequate.

There was no failure to train.[26]

---

[25] It is undisputed that no one can pinpoint the exact moment when the lethal arrhythmia began. Consequently, it is just as likely that it began immediately following Sanford's struggle with Bailey and completion of his handcuffing by Pryor. By any standard, these officer's actions up to that point conformed to their training, and did not violate Sanford's constitutional rights. If that be the case, then any speculation about what could have been prevented by additional training, is irrelevant to this inquiry.

[26] This count is a moot issue if the Court grants summary judgment to the individual Defendants, because a training claim cannot be established under § 1983 absent a finding

## COUNT 12

### THE POLICE OFFICERS' CONDUCT DID NOT CONSTITUTE A VIOLATION OF THE FOURTEENTH AMENDMENT — EITHER UNDER THE SPECIAL RELATIONSHIP OR STATE CREATED DANGER DOCTRINES

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV, § 1. In interpreting the language of the Due Process Clause, the Supreme Court of the United States has said:

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. (Emphasis added).

*DeShaney*, 489 U.S. at 195-96.

"There are, however, two exceptions to this general rule. First, if the state has a special relationship with an individual, the state has an affirmative duty to protect the individual from harm inflicted by third parties . . . . The second exception to the general rule that a state is not liable for the acts of third parties occurs when the state itself creates the danger." *Stevenson v. Martin County Bd. of Educ.*, 3 Fed. Appx. at 30-31 (Emphasis added).

### 1. Special Relationship

---

of a constitutional violation by the person being supervised. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420-21 (4th Cir. 1996).

Insofar as the first exception is concerned, "such a right and corollary duty may arise out of special custodial or other relationships created or assumed by the state in respect of particular persons. The Fourth Circuit "has consistently read *DeShaney* to require a custodial context before any affirmative duty can arise under the Due Process Clause." *Pinder*, 54 F.3d at 1175; *Waybright*, 475 F. Supp. 2d at 551. ("[T]he custodial nature of a special relationship is what gives rise to the government's affirmative duty to protect. . . ."). As noted in *Pinder*, "[s]ome sort of confinement of the injured party [is required for the 'special relationship' to come into play.]." 54 F.3d at 1175. The facts in this case, however, do not demonstrate that the deceased was taken into "custody" in the traditional sense. Rather, the undisputed facts demonstrate that he was a voluntary patient in the hospital who was temporarily restrained due to his medical condition. Sanford was not going to be arrested or civilly committed. Consequently, no special relationship existed.

Furthermore, even if a special relationship existed, for the reasons stated earlier the Police Officer Defendants' conduct in dealing with Sanford was well within constitutional parameters.

### 2. State created danger

The second exception to the general rule that a state is not liable for the acts of third parties occurs when the state itself creates the danger. *Stevenson v. Martin County Bd. of Educ.*, 3 Fed. Appx. at 31. "[A] plaintiff must be able to articulate an action taken by a state actor that creates or substantially enhances a risk that the plaintiff will be harmed. An example of conduct that might fit into this "state-created danger" rubric is found in *Pullium v. Ceresini*, 221 F. Supp. 2d 600, 605 (D. Md. 2002).

Before the Police Officer Defendants were even called to Sanford's room, however, he was, "off the wall." His care nurse describes that he "was such high potential of harming himself." The undisputed facts show that none of the Police Officer Defendants assaulted Sanford, or used that degree of force that was unreasonable under the circumstances. Moreover, the simple fact is that restraining Sanford did not create a danger, or substantially enhance a risk that he would be harmed. Rather, quite the opposite. The Police Officer Defendants' intervention helped end Sanford's extraordinarily violent episode in which harm to Sanford was all but assured if he were left to his own devices. One can only imagine what would have happened if these Defendants had not interceded, and Sanford had been left free to roam his room and the rest of the hospital floor.[27] To that extent, restraining Sanford reduced the risk of harm. It did not increase it.

There was no Fourteenth Amendment violation.

## COUNT 13

### THE POLICE OFFICERS CONDUCT DID NOT CONSTITUTE GROSS NEGLIGENCE UNDER VIRGINIA LAW

Under Virginia law gross negligence is defined as "that degree of negligence which shows such indifference to others as constitutes an utter disregard of caution amounting to a complete neglect of the safety of another person. It is such negligence as would shock fair minded people, although it is something less than willful recklessness." *See Virginia Model Jury Instructions, Civil,* Instruction No. 4.030, 1999 Supp. *See also Harris v. Harman,* 253 Va. 336, 340, 486 S.E. 2d 99 (1997). Each Police Officer Defendant acted appropriately.

---

[27] In that case, we would now be discussing why VCU PD failed to respond in a timely fashion to restrain Sanford from hurting himself, or worse yet, someone else on that floor.

From their arrival they sought to restrain a hallucinating, combative patient who was a danger to himself, the nursing staff and themselves. They utilized the minimum amount of force necessary to control him; then permitted the nursing staff to minister to him. At each step of the way, they monitored him. That he would appear, to the observer, to be breathing and moving, yet suffering from a lethal cardiac arrhythmia, is a factor beyond their knowledge or control. Nevertheless, recognizing that he was in *extremis*, they did what they could to save him. This conduct does not rise to the level of gross negligence.

### COUNTS 14, & 15

### THE POLICE OFFICERS' CONDUCT DID NOT CONSTITUTE WILLFUL AND WANTON NEGLIGENCE; OR WILLFUL AND WANTON CONDUCT UNDER VIRGINIA LAW

"Willful and wanton negligence, on the other hand, is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another" *See Etherton v. Doe*, 268 Va. 209, 213-14 (2004), citing *Griffin v. Shively,* 227 Va. 317, 321, 315 S.E.2d 210, 213 (1984).

For the same reasons that a finding of gross negligence is unsustainable here, so to a finding of willful and wanton negligence or willful and wanton conduct is innapropriate.[28]

---

[28] Willful and wanton negligence and willful and wanton conduct appear to be the same tort under Virginia law.

## COUNT 17

## THE POLICE OFFICERS' CONDUCT DID NOT CONSTITUTE AN ASSAULT AND BATTERY UNDER VIRGINIA LAW

### 1. Assault and Battery

Under Virginia law, an assault is defined as "an attempt or offer, with force and violence, to do some bodily hurt to another, whether from wantonness or malice, by means calculated to produce the end if carried into execution." *Harper v. Commonwealth*, 196 Va. 723, 733, 85 S.E.2d 249 (1955). Plaintiff is required to prove both a "wrongful act" and resultant physical injury. *Pike v. Eubank*, 197 Va. 692, 90 S.E.2d 821, 827 (1956). A wrongful act imports lack of justification or excuse. *Id.*; *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994). A battery is defined as a non-consensual touching of another, however slight. *Pugsley v. Privette*, 220 Va. 892, 899, 263 S.E.2d 69, 74 (1980) (citing *Crosswhite v. Barnes*, 139 Va. 471, 477, 124 S.E. 242, 244 (1924)).

From the nature of the initial call, Bailey had reason to believe that he was responding to the scene of an assault against staff. When he entered Sanford's room, his belief was corroborated by Sanford's acts of lashing out at the nurses. Bailey could have arrested Sanford at that moment, although he also had the authority to "detain" him for questioning until he could resolve what had occurred. While at no time did he intend either of those acts, he was nevertheless authorized under the circumstances to approach Sanford, to talk to him, and even to touch him, albeit in this case for the purpose of getting him back into bed. Plaintiffs cannot complain that Bailey violated the Fourth Amendment on the one hand, yet deny him the right to use that degree of force necessary based on Bailey's "reasonable suspicion" and "probable cause" to believe that a crime had been committed. When Sanford then assaulted and battered Bailey and Lancaster,

44

subsequent touching by all the Police Officer Defendants became justified under the law. When an officer's actions are justified as a matter of law, a claim for assault and battery should be dismissed. *McLenagan*, 27 F.3d at 1009; *Corbin v. Woolums*, 2008 U.S. Dist. LEXIS 95977, *29-30 (E.D. Va. Nov. 25, 2008)(Where handcuffing for the purposes of restraint is legally justified no wrongful act has occurred).

**COUNT 18**

**THE POLICE OFFICERS' CONDUCT DID NOT CONSTITUTE FALSE IMPRISONMENT UNDER VIRGINIA LAW**

False imprisonment is "the direct restraint by one person of the physical liberty of another without adequate legal justification." *W. T. Grant Co. v. Owens*, 149 Va. 906, 921 (1928); *Jordan v. Shands*, 255 Va. 492, 497 (1998). Also "false imprisonment is a wrong akin to the wrongs of assault and battery, and consists in imposing by force or threats an unlawful restraint upon a man's freedom of locomotion." *Id.* "If a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in legal contemplation, constitutes false imprisonment." *Zayre of Virginia. v. Gowdy*, 207 Va. 47, 50, 147 S.E.2d 710, 713 (1966). A person cannot be falsely imprisoned upon a lawful exercise of authority. *Yeatts v. Minton*, 211 Va. 402, 406, 177 S.E.2d 646 (1970).

In this case, confronted with a violent patient kicking and punching at hospital staff, the Police Officers were authorized to arrest Sanford, if not detain him until they could determine what had occurred prior to their arrival. When he assaulted and battered Bailey and Lancaster, probable cause to arrest existed. Since Sanford's arrest would have been authorized under law, there can be no false imprisonment.

45

## COUNT 19

### THE POLICE OFFICERS CONDUCT DID NOT CONSTITUTE INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER VIRGINIA LAW

**1.     Intentional Infliction of Emotional Distress**

In order to make out a claim for intentional infliction of emotional distress, the Plaintiff must allege and prove:  (1) the wrongdoer's conduct is intentional or reckless; (2) the conduct is outrageous and intolerable; (3) the wrongful conduct and the emotional distress are causally connected; and (4) the resulting distress is severe.  *McDermott v. Reynolds,* 260 Va. 98, 101, 530 S.E.2d 902, 903 (2000), citing *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974).  Intentional infliction of emotional distress claims are disfavored under Virginia law.  *Ruth v. Fletcher*, 237 Va. 366, 373, 377 S.E.2d 412, 415 (1989); *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 269 (4th Cir. 2001).

Sanford had committed a crime.  He was subject to arrest.  Handcuffing him would have been appropriate if that was what the Police Officer Defendants intended. That conduct, in and of itself, would not have been outrageous or intolerable.  Instead, they sought to restrain him, to permit him to be medicated and returned to bed.  This does not meet the requirements of the second step of the analysis.

Moreover, the distress Sanford suffered as a result of Defendants' alleged conduct is unknown.  What is known is that Sanford was hallucinating, and appeared to be on drugs.  To what extent he comprehended what was going on, let alone appreciated the events, will never be known.  To what extent, therefore, he suffered any emotional distress from what occurred, would be speculative at best.

46

**2.    The Police Officer Defendants' conduct did not amount to Negligent Infliction of Emotional Distress.**

"Virginia courts hold litigants to a rigorous standard for negligent infliction of emotional distress claims, requiring proof of a physical injury that was 'the natural result of fright or shock proximately caused by the defendant's negligence.'" *Earley v. Marion*, 540 F. Supp. 2d 680, 690 (W.D. Va. 2008) (quoting *Myseros v. Sissler*, 239 Va. 8, 387 S.E.2d 463 (1990)); *see also Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 137-38, 523 S.E.2d 826, 833-34 (2000). For the reasons that Plaintiffs have failed to prove an intentional infliction of emotional distress claim, they also cannot prove this claim either.[29]

## COUNT 22

**THE POLICE OFFICERS' CONDUCT DID NOT CONSTITUTE A COMMON LAW CIVIL CONSPIRACY UNDER VIRGINIA LAW**

A civil conspiracy under Virginia common law is a "combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Werth* v. *Fire Cos' Adjusmen. Bureau, Inc.*, 160 Va. 845, 855, 171 S.E. 255, 259, *cert. denied*, 290 U.S. 659 (1933); *Hechler Chevrolet, Inc. v. General Motors Corporation*, 230 Va. 396, 337 S.E.2d 744 (1985).[30] Virginia common law conspiracy

---

[29] To the extent that a claim is made for negligent infliction of emotional distress, the Police Officer Defendants are also entitled to Sovereign Immunity. *See infra.*

[30] To state a claim for conspiracy to deprive an individual of a constitutional right in violation of § 1983, Plaintiff must allege that defendants (1) "acted jointly in concert" and (2) performed an overt act (3) "in furtherance of the conspiracy" that (4) resulted in the deprivation of a constitutional right. *Hinkle*, 81 F.3d at 421 (internal citations omitted). The only difference between a conspiracy under federal law vs. state law, therefore appears to be the requirement, under §1983, of a constitutional deprivation.

actions, like federal conspiracy suits, may be defended by demonstrating that a single enterprise is involved, hence there is intra-corporate immunity. *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 224-25 (4th Cir. 2004); *Fox v. Deese*, 234 Va. 412, 362 S.E.2d 699, 708 (1987).

For the reasons previously set out in the Police Officer Defendants' response to Count 8, there was no common law civil conspiracy.

### COUNT 1, 2, 3, 4, 6, 8, 9, AND 12

### THE POLICE OFFICER DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY WITH REGARDS TO THE FEDERAL CLAIMS IN THE AMENDED COMPLAINT

Qualified immunity shields public officers "from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hope,* 536 at 752 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). Qualified immunity offers immunity from standing trial rather than a mere defense to the merits. *Saucier*, 533 U.S. at 200; *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To determine the issue of qualified immunity, a court must consider whether the facts show the officer's conduct violated a constitutional right, *Saucier,* 533 U.S. at 201; *Pearson v. Callahan, supra; Unus v. Kane*, 565 F.3d at 123. Secondly, a court should decide whether the right was clearly established such that any reasonable public official should have known. *Harlow,* 457 U.S. at 818; *Unus,* 565 F.3d at 123. This should be

48

done in the specific context of the case rather than as a broad general proposition. *Saucier*, 533 U.S. at 201. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739.

Courts "may exercise their sound discretion in deciding which of the two prongs of the qualified immunity test should be addressed first in light of the particular circumstances of the case at hand." *Pearson*, 129 S. Ct. at 818. If the decision to recognize a constitutional violation rests on a balancing of interests, which is ordinarily difficult in application and not well-defined, "it may be unfair to charge an official with knowledge of the law in the absence of a previously decided case with clearly analogous facts." *Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir. 1987); *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir. 1986); *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995).

As has been discussed *supra*, no evidence supports any constitutional violations. Assuming, however, the District Court does find a constitutional violation was such a violation clearly established at the time each Defendant acted.

1. **Count I – Excessive Force (4th Amendment) - A reasonable Police Officer, in Bailey's position would believe his actions were lawful.**

The question here is whether a reasonable police officer, responding to a nurse's call for assistance to deal with a combative patient, and who is drawn into a struggle with that patient, would know that it is a constitutional violation to restrain the patient in handcuffs while more suitable medical restraints are obtained and while a medication to calm the patient is administered and takes effect. The words of the Fourth Circuit in *Bates*, 216 F.3d at 372, a case involving police interaction with an autistic subject, are worth repeating:

49

Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual. . . . that fact cannot set aside an officer's responsibility to uphold the law and ensure public safety.

At the end of the day, Bailey reasonably believed that he was justified in restraining Sanford, and keeping him restrained as he did. Furthermore, at the time of these events, Bailey would not have any reason to believe that his actions would violate Sanford's constitutional rights. Bailey is entitled to qualified immunity.[31]

2.   **Count 2 – Deprivation of Life (14th Amendment); Count 3 – Excessive Force (14th Amendment); Count 4 – Deliberate Indifference to serious medical needs. (14th Amendment); Count 6 – Involuntarily Committed (14th Amendment); Count 12 – State-Created Danger (14th Amendment) – Reasonable Police Officers , in the Police Officer Defendants' position would have believed their actions were lawful.**

In addition, Bailey is also entitled to qualified immunity in Count 3. Similarly, all the Police Officer Defendants, including Bailey, are entitled to qualified immunity in Counts 2, 4, 6, and 12. Again, in this situation, reasonable officers could not have known that their actions violated Sanford's rights. The *Parrish* case, *supra*, is instructive. There, an intoxicated individual was placed in a van unattended, for a 30-minute ride to a detention center. A "spit mask" was placed over his mouth because officers saw a large amount of fluid in the individual's mouth prior to his transport. During the journey, the intercom connecting the driver from the individual in the passenger compartment did not work and the driver could not hear the passenger. On arrival, it was determined that he had vomited, aspirated the fluid, and died. In assessing a deliberate indifference serious

---

[31] As noted earlier, if the restraint here is deemed to be a "seizure," then the Fourth Amendment controls the analysis. Otherwise, the Fourteenth Amendment is the touchstone to employ. The Defendants suggest that the Fourteenth Amendment is the correct standard.

risk of harm claim brought under the Fourteenth Amendment, the Fourth Circuit held that the officers sued were entitled to qualified immunity.

Unlike *Parrish*, these Defendants never left Sanford's side for the 20 minutes that he was handcuffed. They observed Sanford for signs of distress. They permitted ongoing medical attention. All this, while waiting for stronger restraints so they could return Sanford to his bed. If the defendants in *Parrish* are entitled to qualified immunity, it is difficult to imagine why these Defendants would not also be entitled to that protection.

Moreover, insofar as the deliberate indifference to serious medical needs claim is concerned, there is no indication that these officers knew in December 2006 that the law would impose on them the additional duty to monitor Sanford, over and above what monitoring the nursing staff was providing in his hospital room. Or, that failure to monitor more than what they actually did, under these circumstances, could render them liable for any medical emergency that might develop.[32] Rather, they had every right to assume under the unique facts of this case, that in a hospital setting, where nurses were regularly attending to the patient's needs, that they could rely on the medical staff to safeguard Sanford's medical condition, without fear of violating Sanford's constitutional rights.

At the time of these events, the Police Officer Defendants would not have any reason to believe that their conduct would violate Sanford's constitutional rights. They are entitled to qualified immunity

---

[32] *See Williams v. Kelso*, 201 F.3d 1060, 1064-65 (8th Cir. 2000) (holding that, assuming that jail officials were told to monitor a prisoner's vital signs, "the failure to follow this instruction over a period of about seven hours ...was a matter of negligence at most; there was not a showing of deliberate indifference").

3.     **Count 8 – Civil Conspiracy (14th Amendment)**

For the District Court to find an issue for trial with respect to Defendants "acting jointly in concert," such result would necessarily lower the quantum of evidence needed from that quantum required in *Hinkle* and *Ruttenberg*. There would have to be imputation of substantial knowledge to Defendants of the facts and circumstances of Sanford's illness and vulnerabilities and of a "plan" to harm Sanford that is absent. Responding police officers and hospital personnel would be charged with awareness akin to the knowledge attributed to the patient's assigned doctors and nurses. This expansion of legal responsibility would not have been foreseen in December 2006. Hence, these Defendants should be granted qualified immunity.

4.     **Count 9 – Supervisor Fuller, Failure to Train (14th Amendment)**

Finally, Fuller fulfilled his responsibilities and trained his personnel appropriately. The Police Officer Defendants did not violate Sanford's constitutional rights. Moreover, to the extent that there may have been such a violation, the law at the time would not have put Fuller on notice that additional training was necessary for the handling of a combative patient such as Sanford vs. a combative person on the street. As noted by Captain Warren in his affidavit, "a uniform approach to the combative individual is necessary for officer safety as well as the safety of the public." Nor would Fuller have reasonably known that his officers would need to be hyper vigilant as to the medical condition of a subdued patient, when that patient was being ministered to by nursing staff. Fuller trained his officers accordingly. He is entitled to qualified immunity.

**COUNTS 13, 14, 15, 17, 18, 19 & 22**

**THE POLICE OFFICER DEFENDANTS ARE ENTITLED TO SOVEREIGN IMMUNITY AND GOOD FAITH IMMUNITY UNDER VIRGINIA LAW**

1.      **Sovereign Immunity**

In Count 19, Plaintiffs make a claim for Negligent Infliction of Mental Distress against the Police Officer Defendants.  This action is barred by sovereign immunity. "It has long been settled that a state cannot be sued without its consent...." *Wilson v. State Highway Comm'n,* 174 Va. 82, 89, 4 S.E.2d 746 (1939).  "In Virginia, we have followed the traditional rule that the  State is immune from liability for the tortious acts of its servants, agents and employees, in the absence of express constitutional or statutory provisions making it liable." *Eriksen v. Anderson,* 195 Va. 655, 657, 79 S.E.2d 579 (1954).  *Hinchey v. Ogden,* 226 Va. 234, 239 (1983); *accord  Virginia Bd. of Med. v. VPTA,* 13 Va. App. 458, 465 (1991).

"This immunity is also available to an employee of the state or of one of its agencies who performs supervisory functions or exercises discretionary  judgment within the scope of his employment." *Lawhorne v. Harlan,* 214 Va. 405, 407, 200 S.E.2d 569, 571 (1973).  *See also Hinchey, supra.*  In *James v. Jane,* 221 Va. 43, 51, 282 S.E.2d 864 (1980) the Virginia Supreme Court developed a four-part test to determine whether an individual state employee would be entitled to immunity.  The four factors to be considered are: the nature of the function performed by the employee; the extent of the state's interest and involvement in the function; the degree of control and direction exercised by the state over the employees; and whether the act complained of involved the use of judgment and discretion.

53

Applying the four-factor test in the instant case demonstrates that all five Police

Officer Defendants are entitled to sovereign immunity.  First, as law enforcement officers

for the Commonwealth of Virginia ("Commonwealth") they occupy the type of position

which is entitled to sovereign immunity if the other factors are met.  Second, the

Commonwealth  has a substantial interest in how these defendants did their job because

the State has a substantial interest in operating a proficient University Police Department.

The requirement that these officers will respond appropriately when called is

fundamental to this interest.   Further, it is also beyond question that the Commonwealth

exercises a degree of control and direction over each of these employees as evidenced by

the Chain of Command referenced in Captain Warren's Affidavit describing his rise

through the ranks, and by the fact that this Chain of Command extends upward within the

organization to the Chief of Police. Am. Comp. ¶ 6.  Finally, it is clear that the job of

police officer calls for the exercise of discretion.  Whether to initially approach Sanford

or wait for additional help; whether to employ pain/control techniques, or more forceful

measures; whether to keep Sanford handcuffed and prone for five minutes or fifteen;

whether to wait for heavier restraints or return him to bed in their absence, are all

determinations requiring the exercise of judgment.  Those decisions, which lie at the heart

of this case, are discretionary ones requiring an instantaneous assessment of risk,

consideration of a panoply of factors, and the balancing of numerous interests.  Few

decisions could be more discretionary.

The decisions made by Bailey, Pryor, Carter, LaVigne and Branch, clearly fall

within the protection of the doctrine of sovereign immunity.  "To facilitate the efficient and

effective operation of government, the exercise of discretion vested in governmental

employees should not be affected by threats of personal liability arising from the use of such discretion." *Messina v. Burden*, 228 Va. 301, 308, 321 S.E.2d 657. The claim for Negligent Infliction of Mental Distress should therefore be dismissed as to these Defendants.[33]

## 2.      Good Faith Immunity

In Counts 13, 14, 15, 17, 18, 19 & 22, the Plaintiffs bring claims for a variety of intentional torts under Virginia law. These claims should also be dismissed.

Under Virginia law, "good faith" immunity provides absolute immunity from civil liability where a public servant acts in good faith when exercising his duties in the law enforcement context. In *DeChene v. Smallwood*, 226 Va. 475, 311 S.E.2d 749 (1984), the Supreme Court of Virginia reversed a civil judgment against a police officer, who in good faith arrested someone involved in an accident who would not pay a towing fee for removing and storing his vehicle after the accident. The Court held that an officer who in good faith believed that his actions were factually and legally sound was entitled to absolute "good faith" immunity from a civil suit, even if his arrest proved to be unlawful. *Id.* at 480-81, 311 S.E.2d at 751-52.

This is consistent with other decisions holding public employees absolutely immune from liability when acting in good faith. *See, e.g., Harlow v. Clatterbuck*, 230 Va. 490, 339 S.E.2d 181 (1986)(reversing judgment against correctional employees who in good faith released someone who later committed a crime). "When acting in good

---

[33] In addition, Branch was the shift Supervisor that morning. His subordinates included Bailey, Pryor, Carter and LaVigne. On this basis alone, Branch is entitled to the protection of sovereign immunity in his capacity as a supervisor. One "who performs supervisory functions or exercises discretionary judgment within the scope of his employment" is entitled to immunity. *Lawhorne*, 214 Va. at 407.

faith, the courts will afford [police officers] the utmost protection, and they will recognize the fact that emergencies arise when they are not expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court." *Davidson v. Allam*, 143 Va. 367, 373, 130 S.E. 245, 246 (1925). As the Court stated in *Pike v. Eubank*, 197 Va. at 703-04, 90 S.E.2d at 829:

> I think we should remember the principle that officers of the law, when engaged in a lawful duty which they are performing in a lawful manner, are entitled to the protection of the law that they seek to enforce . . . **[T]hen the law throws around him every protection to which he is entitled as a minister of justice.**

(Citation omitted)(emphasis added).

Furthermore, the undisputed facts fail to establish that Police Officer Defendants acted in bad faith. For these reasons, Counts 13, 14, 15, 17, 18, 19 & 22s against the Police Officer Defendants should be dismissed under the "good faith" immunity doctrine.

WHEREFORE, the Defendants, by counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, asks this Court to grant their Motion for Summary Judgment.[34]

Respectfully submitted,

WILLIE B. FULLER
OFFICER MARK BAILEY
OFFICER ELLSWORTH PRYOR
OFFICER LORAN CARTER
OFFICER CRAIG BRANCH, and
OFFICER AARON LAVIGNE

---

[34] To the extent that the co-Defendants in this case have raised an issue in their memorandum in support of summary judgment that is relevant to these Defendants, they incorporate those arguments here.

By:     /s/
       George W. Chabalewski
       Virginia State Bar Number 27040
       Office of the Attorney General
       900 East Main Street
       Richmond, Virginia 23219
       Telephone: (804) 692-0598
       Fax: (804) 371-2087
       E-mail: gchabalewski@oag.state.va.us

William C. Mims
Attorney General of Virginia

Martin L. Kent
Chief Deputy Attorney General

Maureen Riley Matsen
Deputy Attorney General

Peter R. Messitt
Senior Assistant Attorney General

*George W. Chabalewski
Senior Assistant Attorney General

*Counsel of Record

### CERTIFICATE OF SERVICE

   I hereby certify that on the 24th day of August 2009, I have electronically filed

the foregoing with the Clerk of Court using the CM/ECF system, which will then send a

notification of such filing to the following:

Richard C. Ferris, II, Esquire
Ferris & Ferris
P.O. Box 294
10321 Memory Lane
Chesterfield, Virginia 23832

Charles M. Allen, Esquire
GOODMAN, ALLEN & FILETTI, PLLC
4501 Highwoods Parkway, Suite 210
Glen Allen, VA 23060

By:      _____/s/_____
George W. Chabalewski
Virginia State Bar Number 27040
Attorney for the above Defendants
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
Telephone: (804) 692-0598
Fax: (804) 371-2087
E-mail: gchabalewski@oag.state.va.us