**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Virginia**

TERRY RICHARD SANFORD,
As Administrator of the
Estate of John Charles Sanford,
Deceased, Officially,
Individually, and as a
Beneficiary, et al.,


SEP 1 4 2009

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

     Plaintiffs,

v.                            Civil Action No. 3:08cv835

THE COMMONWEALTH OF VIRGINIA,
et al.,

     Defendants.

### MEMORANDUM OPINION

This motion is before the Court on the PLAINTIFFS' MOTION FOR ADDITIONAL CONSIDERATION (Docket No. 133). Claiming substantial need, the Plaintiffs request disclosure of ten documents identified by Defendants Sammy Lancaster, Jowanna Brown, Baruch Mayer Grob, Jackie Wright, Deborah Bolling, Carol Crosby, Ahmed Sherif, Abdel Meguid, and MCV Associated Physicians ("MCVP") ("the Defendants"), as protected by the fact (or non-opinion) work product privilege. These documents, all of which are maintained by the Virginia Commonwealth University Health System Department of Risk Management ("VCU Risk Management") (Pl.

Memo. at 1), are identified as Documents 14, 15, 17, 18, 19, 22, 23, 24, 25, and 27. Pl. Mem. at 1. [1]

For the reasons set forth in this memorandum, the Plaintiffs' motion will be granted as to Documents 14, 15, 17, 18, 19, 24, 25, and 27, and denied as to Documents 22 and 23.

## BACKGROUND

John Sanford ("the decedent"), who was physically and mentally disabled, died while at the Medical College of Virginia ("MCV") following surgery. Am. Compl. at ¶ 1. The Amended Complaint alleges, inter alia, that various officers of the VCU police department contributed to the decedent's demise by the manner in which they subdued him while he was under medication. Id. at ¶¶ 38-40. Additionally, several doctors and other medical professionals at MCV allegedly mishandled the decedent's medical care, which also allegedly contributed to his death. Id. at ¶¶ 30, 48. Furthermore, after John Sanford's death, his family members were allegedly prevented from seeing his body for a period of four hours and misled as to the nature of his death. Id. at ¶¶ 280-83. In response to threats of litigation allegedly made by the decedent's family members on the day of the incident,

_____

[1]     The briefing seeks additional consideration of Plaintiffs' Motion to Compel (Docket No. 63) dated June 5, 2009.

Def. Mem. at 3, VCU Risk Management took numerous interviews of persons associated with the incident.

On or about April 3, 2009, the Plaintiffs served a subpoena duces tecum on the Defendants using broad, all-encompassing language that requested all documents "relating to the treatment and death of" the decedent. Id. at 2. The Defendants, in moving to quash the subpoena, identified the documents here at issue as responsive to the discovery request but claimed that the documents were protected from disclosure by the work product privilege. Pl. Mem. at 1-2. In response, the Plaintiffs argued that some of the documents contained in the Defendants' privilege log -- the documents now in dispute -- are fact work product. Id. at 2. The Plaintiffs correctly contended that fact work product is available, notwithstanding the privilege, upon a showing of substantial need. Id.

The Court issued a memorandum opinion on the issue (and modified by Order of August 6, 2009, Docket No. 126). Sanford v. Virginia, 2009 U.S. Dist. LEXIS 66484 (E.D. Va. July 31, 2009). In the opinion, the Court held that the documents in question today were non-opinion work product. Id. at *11. The Court found that the Plaintiffs had not shown substantial need for the documents in question, but granted the Plaintiffs leave to demonstrate substantial need. Id. Notably, the Court found that, as of the date of the opinion, the Plaintiffs *had* shown

3

substantial need as to Document 42, which contained statements from two MCV administrators on the day the decedent died.  Id. See also Def. Mem. Exh. A at 4 (listing the component parts of Document 42: two event chronicles and an email).

## DISCUSSION

The work product privilege limits discovery of documents prepared in anticipation of litigation.  As recognized in the recent opinion on the Plaintiffs' motion to compel (Sanford, 2009 U.S. Dist. LEXIS 66484 at *7-8), the application of the work product privilege follows the foundational Supreme Court decision in Hickman v. Taylor, 329 U.S. 495 (1947), as codified in Fed. R. Civ. P. 26(b)(3), as well as Fourth Circuit precedent set forth in National Union Fire Insurance Co. v. Murray Sheet Metal Co., Inc., 967 F.2d 980 (4th Cir. 1992).

The Fourth Circuit recognizes two types of work product privilege.  Opinion work product, which is described as "mental impressions, conclusions, opinions, [and] legal theories . . . concerning the litigation", National Union, 967 F.2d at 983 (quoting Fed. R. Civ. P. 26(b)(3)(B), is absolutely protected from discovery. Fact work product, on the other hand, may be discovered when the seeking party shows both (1) substantial need for the information; and (2) the unavailability of a "substantial equivalent" of the information sought to be discovered.  Fed. R. Civ. P. 26(b)(3)(A); accord National Union, 967 F.2d at 983-84.

4

However, "[d]iscovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." National Union, 967 F.2d at 983 fn.2 (quoting Hickman, 329 U.S. at 516). As the Advisory Committee noted when enacting 26(b)(3) in 1970, the substantial need inquiry "reflects the view that each side's informal evaluation of its case should be protected, that each side should be encouraged to prepare independently, and that one side should not automatically have the benefit of the detailed preparatory work of the other side."

A recent decision by a District Court within the Fourth Circuit, Tustin v. Motorists Mutual Insurance Co., 2009 U.S. Dist. LEXIS 4853, *13-14 (N.D. W. Va. Jan. 23, 2009), described the seeking party's burden as follows: "In showing a substantial need, the movant must specifically articulate the necessity for the documents or other tangible things. The movant must also demonstrate why or how alternative sources for obtaining the substantial equivalent are unavailable." Tustin quoted a Sixth Circuit decision, In re Grand Jury Subpoena Dated Nov. 8, 1979, 622 F.2d 933, 935 (6th Cir. 1980), which noted that "[w]hen a party does not make any showing that other witnesses were unknown to it or unavailable to testify, it is merely 'on a general fishing expedition' into the attorney's files to satisfy itself

that nothing has been overlooked. The work-product protection forbids such excursions." (citations omitted).

Thus, discovery of fact work product is permitted, but a party seeking disclosure must demonstrate that its need is truly substantial, and that there is no reasonable substitute for the documents they seek. If other discovery materials provide substantially equivalent information to that which is privileged, and the Plaintiffs cannot otherwise substantiate their need, the showing is not met. If this showing were unnecessary, the inquiry would be reduced to a simple question of relevance, and the category labeled "fact work product not subject to disclosure" would be rendered a null set. Precedent does not appear to intend such a result. Still, the Fourth Circuit has described the qualified immunity for fact work product as "little more than an 'anti-freeloader' rule," National Union, 967 F.2d at 985; the seeking party's burden is not terribly demanding.

A non-exhaustive list of factors to be assessed in determining substantial need includes: (1) importance of the materials to the party seeking them for case preparation; (2) the difficulty the party will have obtaining them by other means; and (3) the likelihood that the party, even if he obtains the information by independent means, will not have the substantial equivalent of the documents he seeks. Fed. R. Civ. P. 26, advisory committee's note, 1970 Amendments. The committee then

notes that "[c]onsideration of these factors may well lead the court to distinguish between witness statements taken by an investigator, on the one hand, and other parts of the investigative file, on the other." Id.

The Fourth Circuit has addressed the substantial need inquiry with respect to witness interviews, noting that "[s]tatements of either the parties or witnesses taken immediately after the accident and involving a material issue in an action arising out of that accident, constitute 'unique catalysts in the search for truth.'" National Union, 967 F.2d at 985 (quoting McDougall v. Dunn, 468 F.2d 468, 474 (4th Cir. 1972)). Further, "where the part[y] seeking discovery was disabled from making his own investigation at the time, there is sufficient showing under the amended Rule to warrant discovery." Id. "On the other hand, statements taken later . . . are more likely to contain information otherwise available to [the seeking party] through its own efforts to obtain statements or to take depositions." Id.

As noted in McDougall, 468 F.2d at 474, the reason for requiring production of interviews conducted immediately after an accident is that

> [T]he lapse of many months and the dimming of memory provides much reason for [] counsel to examine any substantially contemporaneous declarations or admissions. Aside from what assistance it may be in the preparation of a case for trial, the production of such a statement, after the lapse of time, permits a

7

> more realistic appraisal of cases and should
> stimulate the disposition of controversies
> without trials.

And, as discussed in <u>Coogan v. Cornet Transportation Co.</u>, 199
F.R.D. 166, 167-68 (D. Md. 2001), the ultimate consequences of an
overbroad privilege in this context would be unappealing:

> [I]t would not be reasonable to expect a
> layperson, injured [in an accident], to
> immediately hire an investigator or an
> attorney to record the contemporaneous
> statements of [the party allegedly
> responsible for the accident]. Indeed, a
> contrary decision would make it necessary for
> lawyers to approach injured persons in their
> hospital beds when they are at their most
> vulnerable, a practice that is widely
> condemned as unethical.

As a further reason to allow discovery, the Court in <u>Hickman</u>
noted that "production might be justified where the witnesses are
no longer available or can be reached only with difficulty." 329
U.S. at 511. Fed. R. Evid. 804(a)(3) defines "unavailability" as
encompassing the situation in which the declarant "testifies to a
lack of memory of the subject matter of the declarant's
statement." Though that analysis arose in the hearsay context,
it applies with equally persuasive logic to deposition of a
forgetful witness. If a witness has no memory with which to
answer questions about an incident, for all practical purposes
the witness is unavailable under <u>Hickman</u>, and that unavailability
weighs on the side of requiring that the fact-work-product
interview be disclosed.

8

## THE DOCUMENTS IN QUESTION

Neither party disputes that the documents in question are protected by the work product privilege. Further, it is undisputed that the documents are not protected by the absolute opinion work product privilege, but are, instead, subject to the qualified privilege accorded fact work product. The single issue to be decided with respect to these documents is whether the Plaintiffs have met their burden of demonstrating substantial need, and are thus entitled to discover the documents.

The Defendants begin by attempting to differentiate the documents in question today from Document 42, which this Court previously required the Defendants to disclose because the Plaintiffs had shown substantial need. Sanford, 2009 U.S. Dist. LEXIS 66484 at *11. The Defendants observe that Document 42 was prepared by administrative personnel, whereas the documents in question today were prepared by Risk Management personnel. The applicable law makes no such distinction.

The Defendants also assert that the Plaintiffs seek to "ride to court on the enterprise of another." Def. Mem. at 6. That assertion is overstated. Here, the statements at issue were taken when the Plaintiffs were not able to make inquiry. Indeed, the Plaintiffs were not fully aware of the circumstances surrounding Sanford's death when the statements were taken. Under the circumstances, the Defendants' arguments make no sense.

More troublingly, the Plaintiffs allege that the Defendants prevented them from discovering the true nature of the decedent's death for "many months" after it happened. Pl. Mem. at 17. If there is any truth to that charge, the Defendants' "anti-freeloader" arguments carry no weight whatsoever.

The Defendants next contend that the "witnesses in general actually had quite a lot of memory about the events in question." Id. Yet, the Defendants do not cite a single instance of any question that was answered fully or clearly. For that reason, this argument cannot carry the day, particularly when the Plaintiffs have gone to great lengths to demonstrate otherwise.

The Plaintiffs here have presented numerous claims (perhaps too many), in part because of the difficulty in reconstructing what happened. The events leading up to the decedent's death exemplified chaos; neither perfect memory nor consistency of witness testimony can be expected. But, the more pieces of the puzzle that are revealed, the more comprehensive will be the picture that emerges. With so many different actors and actions at issue, a large number of small pieces may make a significant difference.

Considering the National Union factors, the Court concludes that, for most of the documents they seek, the Plaintiffs have demonstrated that they need the information that the interviews are likely to contain, and that they have made efforts to obtain

the information in other ways, but that no adequate substitute for the documents exists.

In assessing the adequacy of depositions as substitutes for the requested documents, the Plaintiffs identify several deponents' memory failures and testimonial inconsistencies with specificity. They highlight the issues that depositions left unclear but the requested documents may illuminate. They have made an individualized case for substantial need for six of the ten requested documents,[2] which will now be assessed.

## (a) Documents 18, 19, 24, 25, and 27, Relating to Medical Personnel

The Plaintiffs have met their showing for all five of these documents. Because the rationale varies from one document to the next, as does the strength of the Plaintiffs' showing, these documents are discussed individually. The key commonality among these documents is the lack of any substantially equivalent information available to the Plaintiffs.

### (i) Document 18

Document 18 is an interview with Jowanna Brown, a registered nurse at MCV, conducted three days after the decedent died, on December 27, 2006. Pl. Mem. at 7.

The Plaintiffs deposed Nurse Brown on May 20, 2009, nearly two years after the incident. According to the Defendants, this

---

[2] The remaining four Documents are incongruously addressed together in two sentences placed in different sections of the memorandum. Not surprisingly, the Plaintiffs' case for

deposition covered 232 pages. Def. Mem. at 6. The Plaintiffs
have shown inconsistencies between Nurse Brown's deposition
testimony and other evidence on the record. The inconsistencies
relate to how continuously she remained by the decedent's bedside
on the night in question, whether she or another nurse
administered medications to the decedent, and whether she sat on
a mattress atop decedent to hold him down during the incident.
Pl. Mem. at 7-8.

The Plaintiffs allege, and the Defendants do not dispute,
that Nurse Brown was the decedent's primary care nurse during the
time at issue. Id. Hence, she is an important material witness.
Moreover, the alleged inconsistencies between her deposition
testimony and evidence on the record are substantial and
meaningful to the Plaintiffs' case. The centrality of Ms.
Brown's role, combined with the evident incompatibility of her
deposition testimony with hospital records, suggests (though it
does not necessarily mean) that Document 18 may assist the
Plaintiffs (as it may already be assisting the Defendants) in
developing a more complete picture of material events. It could
also strengthen the Plaintiffs' case by providing material to
impeach Nurse Brown's credibility. See Duck v. Warren, 160
F.R.D. 80 (E.D. Va. 1995). As such, the Plaintiffs have shown
substantial need for Document 18.

---

**(ii) Document 19**

Document 19 is an interview with Patricia Ferguson, a registered nurse at MCV, conducted three days after the decedent died on December 27, 2006.

On May 29, 2009, more than two years and five months after the incident, the Plaintiffs deposed Nurse Ferguson. According to the Defendants, this deposition covered 213 pages. Def. Mem. at 6. At her deposition, in response to questions such as whether or not she had spoken to police, whether handcuffs were used, who else was involved in the incident, Nurse Ferguson responded with some version of "I can't remember." Pl. Mem. at 4-5.[3]

The Plaintiffs allege, and the Defendants do not dispute, that Nurse Ferguson was a "crucial participant and eyewitness to the events surrounding John Sanford's death." She is alleged to have placed the initial call to the VCU Police for help, and to have started an IV on the decedent at the time of his restraint. Pl. Mem. at 4.

Nurse Ferguson demonstrated a difficulty in remembering evidence that rendered her practically unavailable to the Plaintiffs, despite the considerable efforts they appear to have

---

[3]     The Plaintiffs attached considerable portions of the deposition testimony to their Memorandum as Exhibits B and C.

taken to coax information out of her. It is possible that the deposition produced some useful information. However, this Court does not consider it substantially equivalent to an interview conducted three days after the incident, while the events were still fresh in Nurse Ferguson's mind. Thus, the Plaintiffs have shown substantial need for Document 19.

### (iii) Document 24

Document 24 is an interview with Dr. Christopher Cost, junior resident in charge of decedent's care. Pl. Mem. at 13. The interview was conducted on December 28, 2006, four days after the event. Id.

The Plaintiffs deposed Dr. Cost as part of discovery. According to the Defendants, this deposition covered 233 pages. Def. Mem. at 6.

Unlike the other medical personnel, Dr. Cost is not a named defendant. The Plaintiffs place Dr. Cost's behavior at issue in only one way, alleging that he may have been the unidentified doctor who, according to statements from two police officers, said after the incident that "anything but Haldol" should have been given to the decedent (who was, in fact, given Haldol). Pl. Mem. at 13. The Plaintiffs also point out that, at one point in his deposition, Dr. Cost had trouble remembering specifics of the night in question. Id. at 13-14.

Because Dr. Cost is not a party, and does not appear to be a

witness to the events that caused decedent's death, the "unique catalyst" language of National Union, 967 F.2d at 985, which assessed post-incident interviews of "either the parties or witnesses," does not clearly apply. The Plaintiffs' strongest need for Dr. Cost's interview appears to be demonstrating that a prescription of Haldol was bad for someone in the decedent's condition, which could probably be established through expert testimony. However, as evidence of internal conflict within the hospital, confirmation that Dr. Cost was indeed the as-of-yet unidentified doctor could strengthen the Plaintiffs' case. And Dr. Cost's specific role as resident in charge of the decedent's care means that the interview may reveal yet other information material to the Plaintiffs' case.

Although it is perhaps the closest question of any of the documents, the Plaintiffs appear to have met their burden to demonstrate substantial need, and Document 24 must be produced. Though it is less central to the Plaintiffs' complaint, it is material, and there is simply no substantial equivalent of an interview taken four days after decedent died.

### (iv) Document 25

Document 25 is an interview with Dr. Ahmed Meguid, the psychiatrist with whom MCV physician residents consulted in attempting to determine how to handle the decedent's care after he became delirious in the hospital. Am. Compl. at ¶ 17. The

15

interview was conducted on December 29, 2006, five days after the incident.

The Plaintiffs deposed Dr. Meguid as part of discovery. According to the Defendants, this deposition covered 212 pages. Def. Mem. at 6.

There is considerable dispute as to whether the decedent's brother, Terry Sanford, advised Dr. Meguid that the decedent was acting abnormally during the few days before he died. Pl. Mem. at 9-11. Dr. Meguid also experienced some memory-related problems answering several questions during the deposition. Id.

The Plaintiffs allege that misdiagnosis led to the decedent receiving toxic levels of medication, which led to his delirium, and which ultimately contributed to his death. Dr. Meguid's communication with the decedent's brother could determine whether Dr. Meguid was put on notice of the decedent's abnormal behavior. This could effect the assessment of whether Dr. Meguid committed medical malpractice.

In sum, although the materiality of Dr. Meguid's interview is more nuanced than that of persons such as Nurse Brown, it is no less important to the Plaintiffs' case. The relationship between Dr. Meguid's actions and the decedent's injuries is most certainly at issue. Again, a two-year old deposition is not substantially equivalent to an interview conducted five days after the incident, where, as here, the doctor lacked

recollection in a significant way. Document 25 must therefore be produced, as the Plaintiffs have shown substantial need.

### (v) Document 27

Document 27 is an interview with Dr. Patrick Maiberger, the on-call physician during the night of decedent's death. Pl. Memo. at 11. The interview was conducted on January 8, 2007, two weeks after the incident. Id.

The Plaintiffs deposed Dr. Maiberger during discovery. According to the Defendants, this deposition covered 204 pages.[4] Def. Mem. at 6.

There is considerable dispute about Dr. Maiberger's response to his pager. Paper records of his pager indicate that he was paged seven times over a period of four and a half hours before he finally returned the eighth page.[5] Pl. Mem. at 11-12, Exh. C. Dr. Maiberger denies having received multiple page attempts. Id. at 12. At approximately 1:30 AM on the date decedent died, Dr. Maiberger prescribed Haldol for the decedent over the phone.

This interview took place long enough after the incident to

---

[4] The number of pages in a deposition has only minimal relevance to whether a deposition provides a reasonable substitute for an earlier interview when the Plaintiffs complain of the deponent's *forgetfulness* between the time of the initial interview and the time of the deposition. But the number of pages is even less relevant when, as here, the Plaintiffs wish to discover any *inconsistencies* between a deponent's testimony and his earlier interview.

[5] Although it is not completely clear from the Plaintiffs' Exhibit F, it is alleged that the page that finally got Dr. Maiberger's attention was one that threatened to contact his

17

push the boundaries of "substantially contemporaneous." It is highly debatable whether an eight-days-later interview meets the standard of immediacy articulated in National Union. Still, memories fade far less in two weeks than in two years.

Moreover, closeness in time is not the sine qua non of substantial need in this context. Any information relating to Dr. Maiberger's responsiveness could have a significant impact on a jury's determination of whether he, and the other medical Defendants, exercised reasonable care in treating the decedent. And like the other interviews with medical personnel, it is hardly accurate to consider the Plaintiffs' deposition as the substantial equivalent of Document 27. Although it is a closer question than for the some of the other documents, the Court finds that the Plaintiffs have met their burden to demonstrate substantial need, and Document 27 must be produced.

### (b) Documents 14, 15, 17, 22, and 23, Relating to Law Enforcement Personnel

As an introductory matter, only Document 15 is discussed by the Plaintiffs in any detail. The Plaintiffs boil their articulation of substantial need for the other four documents down to a single sentence: "[T]he compelled production of all the police officers' interviews would illuminate the truth of the events surrounding Mr. Sanford's death and help to bring clarity out of the conflicts and ambiguities of deposition testimony

superior if he did not respond.

given over two years later." Pl. Mem. at 15. In their summation, they further note that these interviews may help assess whether the decedent was "combative" on the night he died. Id. at 18.

To some extent, the Plaintiffs' somewhat limited showing reflects merely that they have said in summary form all that there is to say based on what they now know. And, in reality, their principal contention is that the Court misapplied, as to these documents, the "unique catalyst" concept articulated in National Union for judging accessibility to statements of parties or witnesses taken immediately after the incident and involving a material issue in the case.

The issue, as now presented, turns, on large part, on the meaning of "immediately" because three of the statements at issue (Documents 14, 15 and 17) are those of parties and witnesses. Two were taken on January 30, 2007 and one was taken on February 2, 2007, slightly more than a month after Sanford's death. Neither party has sought to define "immediately" as used in National Union and the Court has found no definition. However, the statements are follow-up statements of earlier interviews. And, they were taken about a month after the incident when events were relatively fresh in the mind of the giving party. Considering those facts and the inconsistencies and lack of recall demonstrated by the Plaintiffs, the purpose of National

19

Union's "unique catalyst" theory is served by requiring production of these documents. Additionally, these statements have unique value as impeachment. On balance then, as to these three documents, the Plaintiffs have met their burden.

The other two documents are not statements of parties or witnesses and do not qualify under National Union. And, the Plaintiffs have not met their burden otherwise.

## CONCLUSION

For the foregoing reasons, the PLAINTIFFS' MOTION FOR ADDITIONAL CONSIDERATION (Docket No. 133) is denied as to Documents 22 and 33 and granted as to Documents 14, 15, 17, 18, 19, 25 and 27.

It is so ORDERED.

_____/s/_____ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 14, 2009