

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TERRY R. SANFORD,
et al.,

     Plaintiffs,

v.

                         Civil Action No. 3:08cv835

COMMONWEALTH OF VIRGINIA,
et al.,

     Defendants.

### MEMORANDUM OPINION

This matter is before the Court on PLAINTIFFS' MOTION TO DISQUALIFY DEFENSE COUNSEL ON THE BASIS OF A CONFLICT OF INTEREST (Docket No. 209). For the reasons and to the extent set forth below, the motion is granted.

### BACKGROUND

This action arises out of the death of John Charles Sanford on December 24, 2006. At the time of his death, Sanford was a patient in the Medical College of Virginia Main Hospital (the "Hospital") who was recovering from surgery, which had been performed on December 20, 2006, in which his kidney was removed. The Plaintiffs, the administrator of Sanford's estate and several of his relatives, filed this action against a number of medical

personnel employed by the Hospital, a security guard at the Hospital and a number of police officers who are members of the Virginia Commonwealth University Police Department ("VCUPD"). The Hospital is run by the Virginia Commonwealth University Health System ("VCUHS"). The VCUPD officer defendants are employed by the Virginia Commonwealth University ("VCU") and, respectively, are the former Chief and several officers employed by the VCUPD. The VCUHS and VCU are agencies of the Commonwealth of Virginia. At all times pertinent to this action, all of the defendants were acting within the scope of their employment by their respective agencies and under color of state law.

## A. The Nature Of The Claims

The Plaintiffs' claims are now in the third iteration, the Court recently having permitted the filing of the Second Amended Complaint. The claims against the VCUPD defendants (Mark B. Bailey, Ellsworth C. Pryor, Loran B. Carter, Craig L. Branch, Aaron K. LaVigne, and Willie B. Fuller by his guardian) arise out of the conduct of those defendants in restraining John Sanford two days after the removal of his kidney when the VCUPD officer defendants were summoned to Sanford's room by MCV medical personnel. The claim against Sammy Lancaster, a security guard

2

employed by the Hospital, arise out of his conduct in the effectuation of the restraints imposed on Sanford. There are medical malpractice claims against Dr. Baruch M. Grob, Dr. Harry Kou, Dr. Ahmed S. A. Meguid, Dr. Patrick G. Maiberger, and the MCV Associated Physicians, the practice group to which those doctors belong. Also, there are claims against three nurses, Jowanna D. Brown, Patricia M. Ferguson, and Ma. Honey Faye Magdaug, and their supervisor, Chief Nursing Officer ("CNO"), Carol M. Crosby.

The claims against Colonel Fuller and CNO Crosby are grounded in their alleged failures to train properly the VCUPD officer defendants and the nurses respectively.

## B. Sanford's Hospitalization And The Events Before December 24, 2006

The circumstances leading up to the death of John Sanford require brief explication because those facts are pertinent to the disqualification issues. Sanford was admitted to MCV to have surgery for the removal of a kidney on December 20, 2006. At the time, Sanford was 40 years of age, five feet five inches tall, weighed 150 pounds, and was mentally and physically disabled.

He was declared mentally and physically disabled by the Social Security Administration on July 30, 1993. In April 1994, a physician at MCV determined that Sanford was

3

suffering from Biemond's Syndrome, a neurological condition which included cerebellar damage and ataxia (a severe loss of muscular coordination). Sanford's head and body shook almost continuously and, at times, rather violently. He was able to walk only with the assistance of a "walker," and he wore leg braces which extended from knee to foot.

It is alleged that, on December 22, 2006, two days after his surgery, Sanford was found by his brother in the hall outside his room at which time he was naked, delirious, hallucinating, and clinging to a hand rail for support, trying to hold himself upright without the assistance of the walker. It is alleged that Sanford's delirium and hallucinations were the consequence of toxic levels of certain medications prescribed and administered by the MCV medical defendants. The MCV medical staff was aware of Sanford's condition and had summoned the VCUPD to help in restraining him. However, before the VCUPD officers arrived, Sanford's brother, the lead plaintiff in this case, was successful in penetrating the delirium in returning Sanford to his room and getting him into his bed. It is alleged that, on December 23, 2006, other family members found Sanford delirious and hallucinating and concluded that he was not being attended by any physician

4

or nurse because he was on the floor in his hospital room partially disrobed and cleaning up imaginary blood.

As a consequence of the events of December 22 and 23, the lead plaintiff requested a psychiatric consult and liaison service, asserting that the justification therefore was that Sanford was not acting as he usually acted and that he was not being cared for in the manner consistent with his disability and his post-operative condition.

## C. December 24, 2006: Sanford's Death And The Plaintiffs' Claims

On December 24, 2006, it is alleged that Sanford became delirious as a consequence of the medications he had been prescribed and administered by the MCV medical defendants. The nursing defendants (except CNO Crosby) summoned the VCUPD officers (except for Colonel Fuller), and the security guard, Lancaster, to the scene. Lancaster and Officer Bailey of the VCUPD responded and allegedly physically seized Sanford, wrestled him to the ground, put his hands behind his back, handcuffed him with him metal handcuffs and held him prone. He was kept in that position by Bailey, aided by Lancaster and the other VCUPD officer defendants, for approximately thirty minutes. During that time, one or more of the nursing defendants injected him with Haldol, a sedative. After he had been laying

5

handcuffed and prone for approximately thirty minutes, the VCUPD officers and the nursing staff turned Sanford over and discovered that he was dead.

Officer Bailey and Lancaster are alleged to have used excessive force to effectuate an unreasonable seizure in violation of the Fourth Amendment (Count One). All of the VCUPD defendants (except for Colonel Fuller) and security guard Lancaster are alleged to have violated Sanford's due process rights under the Fourteenth Amendment in the means of restraining him.[1]  Three of the nurses, Nurse Ferguson, Nurse Magdaug, and Nurse Brown, are also alleged to have violated the same rights by virtue of their participation in the restraint process and in failing to monitor the defendant while in restraints (Count Two).  In like fashion, all of the VCUPD defendants (except for Colonel Fuller) and the same nurses are charged with the same type of violations, i.e. due process violations of the Fourteenth Amendment rights of Sanford, by creating a danger to Sanford and not dealing with it properly (Count Three).  The same defendants are charged with deprivation of life in violation of Sanford's due process rights under

---

[1]     Allegedly Sanford had a special relationship and a custodial relationship with these defendants and the means of restraint violated his due process rights under the Fourteenth Amendment.

6

the Fourteenth Amendment, by virtue of the same conduct
(Count Four).

Colonel Fuller is charged with violating the
Fourteenth Amendment rights of Sanford by failing to
discharge his supervisory duty to train the VCUPD officer
defendants in how to effectuate the restraint of a mentally
disabled hospital patient, alleging that the violations
committed by the VCUPD officer defendants (other than
Colonel Fuller) are otherwise attributable to him (Count
Five) on a theory of supervisory liability for failure of
adequate training.

CNO Crosby is likewise charged with violating
Sanford's due process rights under the Fourteenth Amendment
by failing to train her employees in the proper manner to
restrain Sanford (Count Six).

All of the VCUPD officer defendants (other than
Colonel Fuller) and security guard Lancaster are charged
with a civil conspiracy to violate the previously alleged
Fourteenth Amendment due process rights (Count Seven).

The VCUPD officer defendants (other than Colonel
Fuller), security guard Lancaster, and nurses Ferguson and
Magdaug are charged with gross negligence in the
application of excessively forceful restraints and failure
to monitor Sanford appropriately while he was thus

restrained (Count Eight). Officer Bailey, Corporal Branch, security guard Lancaster, and Nurse Brown are charged with willful and wanton negligence in the administration of restraints and in Nurse Brown's administration of medicine while Sanford was in restraints (Count Nine). Officer Pryor, Officer Carter, Officer Branch and security guard Lancaster and Nurses Ferguson and Brown are charged with battery, apparently through the restraint conduct and the administration of a high dose of inappropriate medication (Count Ten).

All of the VCUPD officer defendants (except for Colonel Fuller), security guard Lancaster, and Nurses Ferguson and Magdaug are charged with false imprisonment by virtue of the restraint process (Count Eleven). Officer Bailey, Officer Pryor, Officer Carter, Officer Branch, security guard Lancaster, and Nurses Ferguson and Brown are charged with the intentional and/or reckless infliction of mental distress, again by virtue of the application of the restraints (Count Twelve). The VCUPD defendants (other than Colonel Fuller) and security guard Lancaster are charged with a common law civil conspiracy to unlawfully restrain Sanford (Count Thirteen).

The physician defendants, Drs. Grob, Kou, Meguid, and Maiberger, are charged with medical malpractice in several

8

ways (Count Fourteen). Drs. Grob and Kou are charged with breaching the standard of care by improperly prescribing certain medications, by failing to recognize Sanford's delirium, by failing to make an appropriate medical assessment and intervention respecting the delirium, by failing to communicate with other attending physicians and with consultant physicians, and by failing to proactively be involved in the patient's care in failing to supervise those who treated Sanford.

Dr. Meguid is charged with medical malpractice by failing to monitor and follow-up Sanford's compromised condition, by failing to consider the consequences of recommending administration of medications, by failing to communicate with Drs. Grob and Kou and the residents who provided Sanford's post-operative care, by failing to conduct a proper consult assessment, by failing to properly diagnose delirium, and by failing to recommend medical assessment.

Drs. Grob, Kou, and Dr. Meguid are charged also with medical malpractice by failing to know and consider Sanford's baseline physical and medical disabilities in giving orders for his care, by failing to recognize the toxicity of medication and prescribing concurrent medications which were inappropriate, by failing to monitor

9

and adjust his medications, by failing to diagnose the cause of delirium, and by failing to respond to the symptoms of medical toxicity. Dr. Maiberger is charged with medical malpractice by failing to review and know Sanford's medical records, by failing to be aware of other physicians' orders, by not knowing Sanford's baseline condition and pre-existing medical conditions as well as his current medical conditions, by failing to return calls for assistance for a period of two hours and forty-eight minutes while Sanford's condition rapidly deteriorated, by failing to examine Sanford immediately upon learning of his deteriorated condition and perhaps ordering medication without examining his patient, by ordering an improperly high dose of medication without appropriate monitoring, and by failing to give notice to the other defendants of Sanford's already compromised condition.

The same lawyer represents all of the VCUPD officer defendants and Colonel Fuller (the "VCUPD defendants"). Another lawyer represents security guard Lancaster and all of the other MCV employees who are either doctors or nurses (the "MCV defendants"). Thus, each lawyer representing each set of defendants has multiple clients.

## DISCUSSION

The motion to disqualify defense counsel is based upon

Virginia State Bar Rule of Professional Conduct 1.7,

entitled "Conflict of Interest." Rule 1.7 provides that:

> (a) except as provided in paragraph (b), a
> lawyer shall not represent a client if the
> representation involves a concurrent
> conflict of interest. A concurrent conflict
> of interest exists if:
>
>             \* \* \*
>
> (2) there is significant risk that the
> representation of one or more clients
> will be materially limited by the
> lawyers' responsibilities to another
> client, a former client or a third
> person or by personal interest of the
> lawyer.

The rule is explicated by explanatory notes.

Note [8] provides that:

Loyalty to a client is also impaired when a
lawyer cannot consider, recommend or carry out an
appropriate course of action for the client
because of the lawyer's other responsibilities or
interests. The conflict in effect forecloses
alternatives that would otherwise be available to
the client. A possible conflict does not
preclude the representation. The critical
questions are the likelihood that a conflict will
eventuate, and if it does, whether it will
materially interfere with the lawyer's
independent professional judgment in considering
alternatives or courses of action that reasonably
should be pursued on behalf of the client.

Note [9] to Rule 1.7 cautions that the assertion of a

conflict of interest by an opposing party must be "viewed

11

with caution . . . for it can be misused as a technique of harassment." Note [9] observes that, while the "resolution of questions respecting conflict of interest is primarily the responsibility of the lawyer who is undertaking the representation," the Court may raise the question "when there is reason to infer that the lawyer has neglected the responsibility."

In this case, the possibility of the conflict was identified at two pretrial conferences: the Initial Pretrial Conference on March 25, 2009,[2] and the status conference on September 25, 2009. Counsel for both sets of defendants represent that thereafter, each of the lawyers met with their respective clients and, pursuant to Rule 1.7(b), secured the consent of each client to the joint representation. Each lawyer has expressed the view that he will "be able to provide competent and diligent representation to each affected client." Under Rule 1.7, joint representation can be permitted.

The Plaintiffs contend that Note [19] operates to negate the consent. The rule provides:

---

[2] At the Initial Pretrial Conference, counsel for the VCUPD defendants was an Assistant Attorney-General. Thereafter, current counsel, a private practitioner, replaced the Assistant Attorney-General and current counsel was present at the conference in which the matter was raised the second time.

However, when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.

Note [23] provides that:

"[a]n impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question.

According to counsel for the Plaintiffs, the current conflicts exist by reason of substantial discrepancy in the parties' testimony and the incompatibility in positions in relation to opposing parties. Further, it appears that there are substantially different possibilities of settlement of the claims or liabilities in question as to different defendants and that too is a topic that must be examined.

The Court has required the Plaintiffs to specify the conflicts thought to be at issue so that the necessary assessments can be made. The identified conflicts are summarized in the following paragraphs.

In support of the disqualification motion, the Plaintiffs have identified three types of conflict that must be examined respecting disqualification of counsel for

the VCUPD defendants. The Plaintiffs have identified five kinds of conflicts which need to be examined to determine whether disqualification is necessary for the MCV defendants. Each will be considered in turn.

## A. VCUPD Officer Defendants

First, there is, according to the Plaintiffs, the conflict between Colonel Fuller and all of the subordinate VCU police officers respecting the adequacy of training for dealing with hospital patients. Colonel Fuller has admitted that VCUPD officers receive no special training about how to deal with restraining hospital patients. In sum, it is the position of Colonel Fuller that his officers are adequately trained to deal with hospital patients because their general training about how to deal with handcuffed persons includes instruction to check for signs of physical distress and for difficulty in breathing.

The testimony of Officer LaVigne is that subordinate officers received no training for handling patients in a health care setting and Officer Carter testifies that she is not trained to look for signs of distress or difficulty in breathing. Officer Carter's testimony clearly conflicted with Colonel Fuller's testimony on that point. Officer LaVigne's does not. However, LaVigne's testimony would permit an argument that he engaged in no misconduct,

14

and that the lack of training respecting how to deal with hospital patients, not his conduct, was the cause of Sanford's death. Officer Pryor testified that he did not monitor Sanford during the period when he was handcuffed and that places his testimony also at odds with the position of Colonel Fuller respecting the adequacy of training.

Thus, on this topic, the adequacy of training, there appears to be a substantial discrepancy in the testimony of the VCUPD officer defendants and an incompatibility in positions that the VCUPD officer defendants occupy vis-à-vis Colonel Fuller. The possibilities for settlement also appear to be substantially different on the claims and liabilities in question as to Colonel Fuller, on one hand, and the VCUPD officer defendants, on the other.

It is also asserted by the Plaintiffs that there is conflict between the VCUPD officer defendants who initially responded to the summons to Sanford's room and effectuated the seizure by handcuffing Sanford and keeping him facedown on the floor, and those officers who arrived on the scene later. This conflict arises out of the undisputed evidence that the accepted protocol for the VCUPD in situations such as the one here at issue is that the first responding officer provides the lead and that subsequently responding

officers follow the instructions of the lead officer. Officer Bailey was the lead responder and the other defendants, Officers Pryor, LaVigne, and Carter, followed his lead, as specified by the departmental protocol. Further, it appears also that Officers Pryor and Carter followed explicit directions given by Officer Bailey after they arrived at the scene. Thus, the objective evidence is that Officer Bailey took the action which resulted in handcuffing Sanford and in maintaining him in a prone position and that Officers Pryor and Carter acted pursuant to his explicit direction in doing what they did and that Officer LaVigne followed Officer Bailey's lead in accord with the departmental protocol.

These largely undisputed facts present a somewhat clearer incompatibility in the positions occupied by Officer Bailey, on the one hand, and Officers Pryor, Carter and LaVigne, on the other. The latter would be able to assert that their conduct was governed by protocol, which had been set in place when they arrived upon the scene and by the instructions of Officer Bailey. Thus, they could argue that the reasonableness of their conduct, which lies at the heart of their ability to defend a number of the claims against them, must be assessed differently than the conduct of Officer Bailey who was the one who first laid

hands on Sanford and who also dictated that Sanford be kept in handcuffs and be kept facedown in the prone position. The positional incompatibility in presenting a defense is obvious. In addition to the incompatibility of positions in relation to Sanford, the same facts give rise to a considerably different possibility for settlement with respect to Officers LaVigne, Pryor, and Carter on the one hand and Officer Bailey on the other.

Lastly, the Plaintiffs point to a conflict created by an order that was issued by Corporal Branch, the superior of all of the other VCU police officers (excepting Colonel Fuller). Corporal Branch arrived after the other officers had arrived and acted. It was undisputed that Sanford was calm by the time that Corporal Branch arrived upon the scene. It was further undisputed that Corporal Branch gave an order to Officer Bailey and the other officers to keep Sanford in the restraints until stronger restraints arrived from the psychiatric ward (such restraints having been sent for by the nursing staff at the direction of the VCU police officer defendants). Corporal Branch has said that he intended his order to mean that Officer Bailey and the others should keep Sanford handcuffed and prone until the stronger restraints arrived. After issuing that order,

Corporal Branch left the scene.    It also appears that Sanford died during this phase of the restraint.

The testimony of Corporal Branch in this regard gives rise to a potential positional conflict between Officer Bailey and Branch, and also between Colonel Fuller and Corporal Branch.    Because of the sequence in which depositions were taken, it is not clear that there is a positional conflict between Branch and Officer Carter.

A lawyer representing the officers other than Corporal Branch might reasonably be expected to argue to the jury that the conduct of those officers was quite reasonable in view of Corporal Branch's instruction.  Of course, the mere fact that they were following Corporal Branch's instructions would not present a legal defense, but it would present a significant basis for differentiating the reasonableness of the conduct of Corporal Branch on the one hand and the other officers on the other.    Further, the evidence respecting Corporal Branch's instruction gives rise to significantly different possibilities of settlement of the claims and liabilities in question.

Moreover, the situation confronting Officers LaVigne, Pryor, and Carter must be measured in perspective of Officer Bailey's conduct (handcuffing Sanford and keeping him prone) and Corporal Branch's order (to keep him that

way). Thus, it is rather clear that to defend the reasonableness of their conduct, as well as the rightness of their conduct, Officers LaVigne, Carter, and Prior would want to point to the conduct of Officer Bailey and Corporal Branch as the cause of Sanford's death, rather than the action they took in doing what they were told to do by the departmental protocol, by Officer Bailey and Corporal Branch.

## B. VCU Medical Defendants

The motion asserts several conflicts among the VCU medical defendants. First, Dr. Meguid diagnosed Sanford's condition as opium withdrawal rather than delirium, a condition which Dr. Meguid stated might be present in Sanford only in its waning stages. Several defense experts (a pharmacist, a toxicologist, and a psychiatrist) have expressed the opinion that Sanford's symptoms were consistent with delirium, not with opium withdrawal. The Plaintiffs intend to offer evidence that Dr. Meguid's diagnosis was erroneous and that, as a consequence of the misdiagnosis, certain of Sanford's medications were resumed without the necessary, precedent tests. As a consequence, it will be said by other expert witnesses that certain drug levels reached toxic levels and created episodes of

delirium which led to the decision to restrain Sanford and hence to his death.

In other words, the expert opinions of the defense experts will support the conclusion that Dr. Meguid misdiagnosed Sanford. There is a medical malpractice claim against Dr. Meguid and an attorney representing Dr. Meguid would certainly want to present expert testimony that Dr. Meguid's diagnosis was correct. However, there appears to be no such evidence offered on his behalf and, indeed, the defense experts render opinions which make it quite difficult for Dr. Meguid to assert that his diagnosis was a correct one. On this record, there is a significant incompatibility in position between Dr. Meguid and the other medical professionals on this issue. In addition, the existence of the testimony of these other medical experts on behalf of the medical defendants other than Dr. Meguid presents a substantially different possibility for settlement of the claims and liabilities in question.

Second, it is undisputed that Dr. Meguid made a medical note that Haldol should be avoided for Sanford, if possible. Further, Dr. Meguid recognized that Haldol might not be appropriate for a patient with Biemond's Syndrome and that the drug could have adverse cardiac side effects. Dr. Maiberger, however, prescribed Haldol and Nurse Brown

or Nurse Ferguson administered Haldol. Neither of the three were aware of Dr. Meguid's cautions respecting the use of Haldol for Sanford. At oral argument on the disqualification motion, counsel for the medical defendants asserted that it was the position of Dr. Maiberger and Nurse Brown that they had no reason to be aware of Dr. Meguid's caution because Dr. Meguid had not entered his note in the computerized system which, in turn, would have alerted the nurses to Dr. Meguid's cautionary advice. That failure is a further indictment of Dr. Meguid.

Quite clearly there are conflicting positions presented by the testimony. Dr. Meguid certainly is entitled to present, as part of his defense, that he cautioned against the use of Haldol. At the same time, Dr. Maiberger and the nurses intend to say that they had no reason to know of this caution because Dr. Meguid did not act in accord with established procedure at the Hospital to take the necessary actions to alert them to his caution. Counsel for Dr. Maiberger and the nurses, therefore, would certainly want to point the finger of fault toward Dr. Meguid as part of the means of defending Dr. Maiberger and the nurses.

Neither Dr. Maiberger nor the nurses have asserted the position (Dr. Meguid's failure to enter the note in the

computer) that quite logically might assist in exonerating them from liability, if supported by the evidence and if accepted by the jury. Also, there is a positional incompatibility between Dr. Maiberger and Nurse Brown, on the one hand, and Dr. Meguid, on the other as respects the propriety of using Haldol to sedate Sanford. Additionally, the factual differences presented by the potential different defenses present substantially different possibilities of settlement of the claims and liabilities in question.

Third, it is alleged that there exists a conflict between CNO Crosby and Nurse Brown on the issue of training. CNO Crosby asserts that Nurse Brown was properly trained in every respect and, in particular, in the restraint policy that CNO Crosby says that she established. It is beyond dispute that Nurse Brown violated the restraint policy as it is understood by CNO Crosby. Thus, as the Plaintiffs contend, if CNO Crosby properly trained Nurse Brown to follow the policy, then Nurse Brown ignored that training and that fact would certainly be pertinent in making out a defense for Chief Nurse Crosby. On the other hand, if Nurse Brown complied with her training, then a reasonable juror could conclude, and counsel representing Nurse Brown would want to argue, that she was not properly

trained and that her actions were reasonable ones. Here too, there is a positional conflict between these two defendants.

Fourth, it is alleged that there is a likely conflict between Dr. Grob, the urologist who performed the surgery and under whose care Sanford was at the time of the incident, and Dr. Koo, an attending physician. Dr. Grob was on vacation at the time of Sanford's death, and had delegated the task of post-operatively caring for Sanford to Dr. Koo. Dr. Koo is a newly added defendant, and he has not been deposed so it is uncertain what his position will be. The claims against Dr. Grob include failing to recognize signs of Sanford's delirium, failing to supervise residents, failing properly to communicate with consultant physicians and failing properly to communicate with the attending physician who was covering for Dr. Grob. That physician is Dr. Koo.

Dr. Grob has fastened his defense on the fact that he was on a holiday vacation, and that he had turned all of the responsibility for Sanford's care to Dr. Koo as a covering attendant physician. Thus, it appears rather likely that there is a conflict between Dr. Grob and Dr. Koo. The conflict is positional in nature and has a

significant impact on the settlement possibilities, particularly as to Dr. Grob.

Finally, it is alleged that Dr. Maiberger was not properly advised of the facts by Nurse Brown at the time that he had prescribed the administration of Haldol for Sanford. Dr. Maiberger prescribed the use of Haldol without seeing Sanford and did so on the basis of a description given by Nurse Brown over the telephone to the effect that Sanford's conduct was such that it took six officers to hold Sanford down. The record simply does not support the version of facts communicated by Nurse Brown to Dr. Maiberger. Indeed, there is evidence that only two people were involved in handcuffing Sanford; that the task was accomplished relatively quickly; and that Sanford was in fact calm well before Haldol was administered. It seems rather clear that the defense of Dr. Maiberger requires a showing that his conduct was reasonable in perspective of the information that he was given by Nurse Brown. And, of course, if that information was wrong, then Dr. Maiberger would have a defense, the existence of which would require the lawyer defending Dr. Maiberger to point at Nurse Brown's inadequate information as a means of exonerating Dr. Maiberger. That evidence would point necessarily, in

an inculpatory fashion, to Nurse Brown. That conflict is positional and is pertinent to settlement issues.

## C. The Legal Principles

Pursuant to Local Civil Rule 83.1(I) of this Court, the standard relating to the practice of law in civil cases in this Court is the Virginia Rules of Professional Conduct as published effective January 1, 2000.[3] Rule 1.7 of the Virginia Rules of Professional Conduct governs conflicts of interest. As noted above, Rule 1.7 prohibits a lawyer from representing a client if the representation involves a concurrent conflict of interest, which exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." The notes to Rule 1.7 make clear that "[l]oyalty and independent judgment are essential elements in the lawyer's relationship to a client." Rule 1.7, Note [1]. This assessment ought to be undertaken at the beginning of the representation of multiple clients in the same action, but the rules make clear that if the conflict arises after the representation

---

[3] The current edition of the Virginia rules is not substantively different than the 2000 version for purposes of the issue in this case. In any event, the parties have used the current version of the Virginia rules, thereby signifying their agreement that the disqualification motion should be assessed under that version.

25

has been undertaken, it is the obligation of the lawyer to withdraw from the representation. Rule 1.7, Note [4].

"Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that otherwise would be available to the client." Rule 1.7, Note [8]. It is also important to note that "[s]imultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (a)(2)" of Rule 1.7. Rule 1.7, Note [23]. "An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." Id.

The United States Court of Appeals for the Fourth Circuit has made clear that:

> In determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances 'with hair-splitting nicety' but, in the proper exercise of its supervising power over the members of the bar and with the view of preventing 'the appearance of impropriety,' it is to resolve all doubts in favor of disqualification.

United States v. Clarkson, 567 F.2d 270, 273 n. 3 (4th Cir. 1977) (citations omitted). In other words, the assessment must be made in perspective of the realities of the case.

It is, of course, important in our system of justice that parties be free to retain counsel of their choice. "However, this Court has held that the right of one to retain counsel of his choosing is 'secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar.'" Tessier v. Plastic Surgeries Specialists, Inc., 731 F. Supp. 724, 729 (E.D. Va. 1990) (citations omitted). Accordingly, "[t]here must be a balance between the client's free choice of counsel and the maintenance of the highest and ethical and professional standards in the legal community." Id. Moreover, the party seeking disqualification has a high standard of proof to show that disqualification is warranted. Id. These principles are well settled.

The rules of professional responsibility make clear that the resolution of conflict of interest questions is principally the responsibility of the lawyer undertaking the litigation. However, those rules also make equally clear that, during litigation, it is appropriate for a court to raise the question in certain circumstances, or

27

the conflict can be raised properly by opposing counsel. Rule 1.7, Note [9]. "Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment." Id. In this case, the Court pointed out the potential for conflict of interest at the Initial Pretrial Conference and at a subsequent scheduling conference and urged counsel carefully to assess the conflict situation mindful of the admonition in Clarkson that principles of the appearance of impropriety had to be considered in making an assessment.[4]

While, as the Fourth Circuit explained in Clarkson, the assessment to be made in a disqualification motion cannot be made with "hair-splitting nicety," it is nonetheless true that the asserted conflict must be a real one and not a hypothetical one or a fanciful one. Aetna Casualty & Surety Company v. United States, 570 F.2d 1197,

---

[4] The VCU medical defendants assert that the motion is brought in this case in bad faith as a tactical advantage. However, the assertions made by the VCU medical defendants are conclusory in nature and illustrate no basis for belief that bad faith lies at the core of the motion. Indeed, the Plaintiffs have a geniune interest in assuring that the issues in this somewhat complex litigation are litigated fully and fairly so that a verdict in the Plaintiffs' favor, if rendered by the jury, would be fully sustainable. And, considering the previous admonitions of the Court to defense counsel that they should be especially careful of conflicts of interest, it can hardly be said that the Plaintiffs are acting out of either bad faith or tactical advantage. Certainly, the record presents no basis for either conclusion.

1200-01 (4th Cir. 1978); Richmond Hill Associates v. The City of Richmond, 690 F.2d 1086, 1089-90 (4th Cir. 1982) (explaining the necessity for a real and concurrently existing conflict of interest rather than a hypothetical one). Put another way, disqualification simply cannot be based on mere speculation that "a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur." Shaffer v. Farm Fresh, Inc., 966 F.2d 142, 145 (4th Cir. 1992). The applicable rule requires disqualification when the independent professional judgment of the lawyer is likely to be affected. Accordingly, some stronger indicator than judicial intuition or surmise on the part of opposing counsel is necessary to warrant the "drastic step of disqualification of counsel." Id. at 145-46.

As explained above, the conflicts that are presented here are real conflicts. They exist now and they have existed throughout the course of the case. They have significant impact on the conduct of the trial respecting how best to serve the interests of the individual defendants who are affected by the extant conflicts.

Furthermore, the conflicts here raise the serious prospect that the trial could fall into disarray. This prospect has actually manifested itself in the motions for

summary judgment presented by the defendants and in the presentation of expert testimony, including several contentions of law and opinion favoring the interest of one defendant while presenting the prospect of real harm to others.

It is obvious from reviewing the motions for summary judgment and the expert opinions that counsel, both for the VCUPD officers and the VCU medical defendants, have staked out defensive positions that they think are the best positions for the defense side of the case considered as a whole. It does not appear, however, that counsel have considered, or that they appreciate, how the assertion of those positions could affect the ability of each individual defendant to defend herself or himself by presenting arguments that other defendants are really responsible for Sanford's tragic death even though another defendant may have had some involvement in the circumstances leading up to that death. Nor do the summary judgment papers indicate that these potential individual defenses have been developed or pursued.

Having conferred with counsel on the issues in this case on a number of occasions in connection with motions to dismiss and discovery issues and having studied the briefs in support of motions for summary judgment made by all of

the defendants, as well as a motion for summary judgment made by the plaintiffs, and having examined the expert opinions in the case filed by both sides, the Court must conclude that the conflicts alleged here are real ones that are currently in existence.   The conflicts also present very real risks of serious, adverse consequences for the rights of the litigants, mostly the defendants, but also those of the plaintiffs.

Moreover, the nature of the conflicts is such that disqualification is necessary to ensure and preserve trust in the integrity of the bar.   The present record contains testimony that tends to inculpate the VCUPD officers in different degrees.   That same testimony would permit some VCUPD officer defendants to urge their exoneration by arguing that other VCUPD officer defendants are the cause of Sanford's death.   The same is true respecting the VCU medical defendants.

Each defendant is entitled to use the record to exonerate himself or herself even if to do so inculpates another defendant in the same category of defendants (i.e., the same group of clients).

The pleadings, motions and briefs filed thus far afford no indication that such a course in being pursued on behalf of any defendant who, from the record evidence,

could take it. Of course, that course need not necessarily be pressed in summary judgment motions. But, the record shows that the option to pursue that course clearly will be available at trial. The option can be exercised by the asking of questions, or by refraining from asking questions and by asking for instructions. And, most importantly, it can be pursued in closing argument. Of course, a lawyer who represents all defendants is not free to pursue such a course on behalf of any defendant because to do so would be to act adversely to one or more of his other clients. On the other hand, the failure to pursue such a course compromises the interest of any defendant on whose behalf that approach could be taken at trial.

The failure to take such a course in a case, when the opportunity exists to do so, creates an appearance of impropriety in a multiple representation even if the motivation for doing so is the notion that somehow to eschew the best defense for each individual defendant presents the best defense for the group of clients considered as a whole. No matter how well motivated the latter course may be, it cannot be realistically pursued unless each defendant is separately and meaningfully advised about the risks inherent in taking that course of action. That advice must be given by a lawyer whose only

loyalty is to that defendant who is giving advice as to that defendant's best interest. There is no showing that this had occurred.

Counsel for each group of defendants asserts that disqualification is not required because all of the defendants have consented to multiple representations. It is true that Rule 1.7(b) provides that the written consent of the client may allow counsel to represent clients who otherwise would not be representable under Rule 1.7(a)(2). However, there are four conditions to a representation under the consent process: (1) the lawyer must reasonably believe that he will be able to provide competent representation to each affected client; (2) the representation must not be prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another; and (4) the waiver of conflict must be in writing. Rule 1.7(b). The second and third conditions above do not present any problems for the counsel in this case. As will be explained below, the fourth condition, for purposes of the Plaintiff's motion, is not dispositive, and the Court will assume compliance therewith. However, the Court cannot conclude that any lawyer reasonably could believe, as the first condition requires, that he would be able to provide competent and

33

diligent representation to each of the affected clients identified in the foregoing discussion of conflicts.

At the Initial Pretrial Conference and at a status conference, counsel were asked to explain in some detail the nature of the case beyond that which was set forth in the rather lengthy complaint. After those explanations were given by the Plaintiffs' counsel and by counsel for both sets of defendants, the Court expressed concern that, inherent in the positions being related by counsel for the defendants and the evidence related by both sides, there was a real risk of conflicts of interest among each set of defendants. It appears that, as discovery took place, the positional conflicts mentioned to counsel in those conferences actually became manifest in each camp. The conflicts appear to have become exacerbated after the compelled production of certain withheld documents. However, these conflicts, while rather obvious, do not appear to be recognized by the lawyers in either camp.

For consent to be effective under Rule 1.7(b), it must be meaningful and that, in turn, necessitates that the clients be advised clearly about the conflicts that might very well arise.

The record shows that each of the VCUPD defendants, including the legal guardian for the now incompetent Colonel Fuller, signed documents stating the following:

> I, [Defendant's name], hereby declare that, notwithstanding the existence of any possible conflicts of interest, I knowingly and voluntarily consent to the continued representation by [counsel for the VCUPD Defendants] in this matter. This informed consent is made after consultation with my attorney.

Although counsel for these defendants asserts that the consent was provided knowingly and voluntarily, there is no basis in the record to conclude that the affected defendants had the very real conflicts described to them thoroughly and accurately. And, such a showing is essential especially where, as here, the conflicts are so patent and so numerous and have such potentially adverse consequences for many of the defendant clients. The absence of that showing alone renders the record on consent here insufficient to animate the exception permitted by Rule 1.7(b).

Counsel for the VCUPD defendants obtained signed, written consent from each officer. Counsel for the MCV defendants has filed no such consent with the court. They have orally averred that they have obtained such consent, from each defendant on November 2, 3, or 4, in compliance

with Rule 1.7(b)(4).[5]   For purposes of this motion, and because the existence of a signed consent waiver would not change the outcome, the Court will take counsel's averment at face value.

Setting aside the importance of obtaining properly executed written consent, to focus on the particularities of the conflict waivers is to miss the key point.   As provided in Note [19] to Rule 1.7, "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent."   In this case, neither of these counsel were in position to request a waiver because, for the reasons set forth fully above, neither reasonably could have believed that, under the circumstances of this case, they could represent all of the defendants whom they undertook to represent.

---

[5] The 2000 version of the Virginia rules does not require written consent.

## CONCLUSION

For the foregoing reasons, the PLAINTIFFS' MOTION TO DISQUALIFY DEFENSE COUNSEL ON THE BASIS OF A CONFLICT OF INTEREST (Docket No. 209) is granted. The question arises whether the grant of this motion to disqualify permits existing counsel to remain in the case for any of the defendants. The approach taken in the Virginia Rules of Professional Responsibility is that "[o]rdinarily, the lawyer would be forced to withdraw from representing all of the clients if the common representation fails." Rule 1.7, Note [29]. See also id. Note [4] ("Where more than one client is involved and the lawyer withdraws because a conflict arises after representation, whether the lawyer may continue to represent any of the clients is determined by Rule 1.9."). This commentary leaves open the possibility that a lawyer might remain as counsel to one or more defendants even if he is disqualified from representing all defendants. Considering the complex issues presented in this record and the rather significant nature of the conflict, it appears that this case ought to be one in which counsel, having been disqualified, should not further remain in the case. However, it is appropriate to leave that prospect open and to allow for discussion and

further assessment of that issue after each defendant is separately advised by counsel not laboring under conflicts.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
December 2, 2009